IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| ALYSSA REID, | ) | |
| | ) | CIVIL ACTION NO.: __5:21cv00032__ |
| Plaintiff, | ) | |
| v. | ) | |
| JAMES MADISON UNIVERSITY, | ) | |
| A Public University, and JONATHAN R. | ) | |
| ALGER, sued in his official and | ) | |
| Individual capacities; HEATHER | ) | COMPLAINT |
| COLTMAN, sued in her official and | ) | |
| individual capacities; ROBERT | ) | |
| AGUIRRE, sued in his official and | ) | JURY TRIAL DEMANDED |
| individual capacities; and AMY M. | ) | |
| SIROCKY-MECK, sued in her official | ) | |
| and individual capacities, and JANE or | ) | |
| JOHN DOES 1-5, sued in their official | ) | |
| and individual capacities, | ) | |
| | ) | |
| & | ) | |
| U.S. DEPARTMENT OF | ) | |
| EDUCATION | ) | |
| & | ) | |
| MIGUEL CARDONA, | ) | |
| SECRETARY OF EDUCATION | ) | |
| U.S. DEPARTMENT OF | ) | |
| EDUCATION, sued in his official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Alyssa Reid, by and through her attorneys, New Civil Liberties Alliance, and for

her complaint against Defendants, hereby states and alleges the following.

**INTRODUCTORY STATEMENT**

Plaintiff Alyssa Reid began her professional career in the summer of 2012 when James

Madison University ("JMU" or "University") hired her as the Assistant Director of the "Individual

Events Team" in the School of Communication.  Being a nationally recognized debater during her own college career, she had much to offer the Forensics Team members and her students in terms of training and guidance to assure success, not only during their college tenure but thereafter as well.  She is a critical scholar and, for her, being an educator extended beyond a mere vocation, but was instead an intrinsic aspect of her identity. She was passionate about education and teaching and felt especially compelled to help her students craft their own voices in order to advocate for those things that were important to them, whether it be the arts, politics, LGBTQ issues, or interpersonal relationships.  She has long been a staunch advocate for survivors of harassment and abuse and used her debating and communications skills to give voice to their experiences.

In December 2018 JMU and the other named Defendants employed by the University changed Alyssa's life forever, wreaking havoc on her career and destroying her personal reputation and ability to continue working for the University. In taking the actions that they did, these Defendants were complicit in allowing Alyssa's ex-girlfriend (Kathryn Lese) to co-opt and hijack the University's Title IX Office and proceedings to exact revenge for a bad breakup.  By accepting and moving forward with Lese's "complaint," these University Defendants weaponized Title IX to destroy Alyssa's life, while shielding Lese from having to make even the most rudimentary effort to defend her claims, present any evidence to support them, or confront Alyssa.

These University Defendants ultimately did exactly what Lese wanted them to do.  They used Title IX to punish Alyssa by branding her as a sexual abuser, thereby making it impossible for her to continue working in her chosen career.  It is common knowledge that *anyone* who is found to have committed or engaged in sexual harassment, sexual discrimination or sexual misconduct under Title IX becomes almost a pariah in our society, especially in higher education. This reputational destruction is compounded, as here, when the accused is never given the due

process to which she is entitled in order to clear her name and expose the falsity of the accusations made. Lese knew that. These Defendants knew that. Yet they still allowed Lese to pursue just such a claim, while also protecting her from showing up at the Title IX hearing, from being subject to cross-examination, and from presenting evidence to support her allegations. In a "she said, she said" situation, these Defendants chose sides, and in doing so empowered Lese to continue to abuse, harass and attack Alyssa for ending their relationship. When Alyssa sought their assistance under Title IX to stop Lese's harassment and abuse, they never bothered to respond.

The University Defendants' treatment of Alyssa is especially egregious in light of JMU's own written policies for intaking, investigating, and responding to Title IX complaints. These Defendants did not just become advocates for Lese, they literally wrote her "complaint" in order to shoe-horn her accusations into an actionable claim to allow them to proceed under a policy that never existed at the time of the alleged offending conduct. In short, because Lese had not filed a valid or viable Title IX complaint against Alyssa, these Defendants, and most specifically Amy Sirocky-Meck, crafted one out of whole cloth. Defendant Amy Sirocky-Meck ultimately presented *her* version of Lese's allegations to Alyssa and demanded that she defend against *her* accusations. These Defendants then proceeded to try Alyssa under a set of rules and policies that did not exist during the relevant time-frame of her relationship with Lese, thereby retroactively applying definitions, concepts, prohibitions, and mandates that could not possibly have governed Alyssa's conduct or provided a basis for Lese's later accusations.

The University Defendants' approach ensured that Alyssa did not have fair notice of the accusations against her, prevented her from fully defending herself, prevented her from exposing the fact that Lese's complaint was simply a continuation of her harassment and abuse, and violated every tenent of fair play and due process to which Alyssa was entitled.

Alyssa has suffered severe consequences as a result of these Defendants' actions. Because these Defendants chose to protect her harasser and abuser, Alyssa was forced to give up her dream job at JMU.   It was simply not possible to continue her employment with the University considering that Lese was a full-time faculty member there.

Defendants' actions have changed Alyssa's life forever.  They have deprived her of her constitutional rights to due process and violated her rights and entitlements as protected by Title IX.  She has been devastated personally, emotionally, professionally and financially.  She has been cast out and ostracized from the speech and debate world.  She was prohibited from even interviewing for the head coaching position at JMU, for which she was highly qualified.  These Defendants must be held accountable for their actions and prohibited from ever doing anything similar to anyone else in the future.

## PARTIES

1. Plaintiff Alyssa Reid is a natural person and a lawful permanent resident of the State of Pennsylvania and the United States.

2. Plaintiff Reid was a member of the faculty at James Madison University ("JMU" or "University").

3. Plaintiff Reid is a female.

4. Plaintiff has provided the proper statutory notice regarding her claims against the University and the Defendants employed by the University.

5. Defendant JMU is a post-secondary academic institution and public university organized and existing under the laws of the Commonwealth of Virginia.

6. JMU's principal place of business is located in Harrisonburg, Virginia.

7.  Defendant Jonathan R. Alger ("Alger"), at all times relevant hereto, has been a resident and citizen of the State of Virginia and the President of the University.  He is sued in his individual and official capacities.

8.  Defendant Heather Coltman ("Coltman"), at all times relevant hereto, has been a resident and citizen of the State of Virginia and the Provost and Senior Vice President for Academic Affairs for the University.  She is sued in her individual and official capacities.

9.  Defendant Robert Aguirre ("Aguirre"), at all times relevant hereto, has been a resident and citizen of the State of Virginia and the Dean of the College of Arts and Letters for the University.  He is sued in his individual and official capacities.

10. Defendant Amy M. Sirocky-Meck ("Sirocky-Meck"), at all times relevant hereto, has been a resident and citizen of the State of Virginia and the Title IX Coordinator for the University.  She is sued in her individual and official capacities.

11. Defendants JMU, Alger, Coltman, Aguirre, and Sirocky-Meck are collectively referred to below as "the University Defendants."

12. Defendant United States Department of Education ("ED") is an agency of the United States of America.

13. Defendant Miguel Cardona is the Secretary of ED and is responsible for overseeing ED's rulemaking and enforcement activities.  Secretary Cardona is sued in his official capacity.

## JURISDICTION AND VENUE

14. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1378 because:  (i) the federal claim arises under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal

law claims as to form the same case or controversy under Article III of the United States Constitution.

15. This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

16. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

17. This Court has jurisdiction pursuant to 28 U.S.C. § 1346 as ED is an agency of the executive branch of the United States.

18. This Court also has jurisdiction pursuant to 28 U.S.C. § 2201 (declaratory relief), and § 2202 (injunctive relief). The former authorizes this Court to "declare rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree…." The latter provides that this Court may grant "[f]urther necessary or proper relief based on a declaratory judgment or decree…."

19. Judicial review against the U.S. Department of Education and Secretary Cardona is also sought pursuant to the APA, 5 U.S.C. §§ 701-706.

20. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391. Defendants JMU, Alger, Coltman, Aguirre, and Sirocky-Meck are located and/or reside in this judicial district and a substantial part of the events, actions, or omissions giving rise to the claim occurred in this judicial district.

## STATEMENT OF FACTS

I.      **DEPARTMENT OF EDUCATION ACTIONS**

**21.** Title IX says, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

**22.** ED, through the Secretary of Education, has rulemaking authority.  20 U.S.C. § 1221e-3.

**23.** ED's Office of Civil Rights ("OCR") is tasked with enforcing Title IX.

**24.** OCR does not have rulemaking authority.

A.  **The 1997 Guidance**

**25.** On March 13, 1997 ED issued a guidance document entitled "Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("1997 Guidance").

**26.** The 1997 Guidance contained a lengthy section entitled, "Prompt and Equitable Grievance Procedures," which spelled out requirements schools must satisfy in investigations and adjudications of allegations of sexual misconduct by either students or faculty.

**27.** The 1997 Guidance did not mandate that sexual misconduct investigations take any particular form.

**28.** The 1997 Guidance listed six "elements" OCR would use "in evaluating whether a school's grievance procedures are prompt and equitable," but ultimately left schools with the flexibility to shape their policies based on local needs: "Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience."

29. None of the six "elements" identified in the 1997 Guidance was the preponderance of the evidence standard of proof, or any evidentiary standard, and the 1997 Guidance does not elsewhere require adoption of any particular evidentiary standard.

30. The 1997 Guidance also cautioned schools to protect the rights of the accused.

31. The 1997 Guidance noted that "a public school's employees may have certain due process rights under the United States Constitution," and the "rights established under Title IX must be interpreted consistently with any federally guaranteed rights involved in a complaint proceeding."

32. The 1997 Guidance also cautioned that "procedures that ensure the Title IX rights of the complainant while at the same time according due process to both parties involved will lead to sound and supportable decisions."

## B. The 2001 Guidance

33. On January 19, 2001, OCR published a guidance document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").

34. The 2001 Guidance's section on "Prompt and Equitable Grievance Procedures" mirrored, almost word-for-word, that same section from the 1997 Guidance.

35. The 2001 Guidance addressed procedures for handling allegations raised against faculty "at every level of education."

36. The 2001 Guidance warned every school that it might be held liable by the government for failing to take adequate steps to prevent sexual discrimination or harassment "whether or not it knew or should have known about it, because the discrimination occurred as part of

the school's undertaking to provide nondiscriminatory aid, benefits, and services to students."

### C.  **The 2011 Dear Colleague Letter**

37. On April 4, 2011, OCR published a "Dear Colleague Letter" on sexual harassment ("2011 DCL").

38. Although the 2011 DCL styled itself as a "significant guidance document" and claimed that it "does not add requirements to applicable law," it in fact added numerous requirements to those contained in the 2001 Guidance and the law itself.

39. ED did not subject the 2011 DCL to the Administrative Procedure Act notice-and-comment process before promulgating it.

40. The 2011 DCL directed schools to "take immediate action to eliminate harassment, prevent its recurrence, and address its effects."

41. The 2011 DCL expressly required, as part of schools' mandated efforts to publish and implement procedures for the "prompt and equitable resolution" of sexual misconduct claims, that schools adopt a preponderance of the evidence standard of proof in their investigations of allegations of sexual misconduct.

42. The 2011 DCL gave schools no leeway in terms of the standard of proof to be employed when addressing Title IX complaints:

Thus, in order for a school's grievance procedures to be consistent with Title IX standards, the school *must* use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred). The "clear and convincing" standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. *Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX.* Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.  (Emphasis added).

**43.** The 2011 DCL provided two bases for imposing the preponderance of evidence standard upon schools.

**44.** First, it noted that OCR uses that standard (a) "when it resolves complaints against recipients," i.e., educational institutions, alleging they have failed to establish a grievance regime which complies with Title IX, and (b) when it conducts "fund termination administrative hearings."

**45.** The 2011 DCL never explained why or how the use of that standard in OCR actions related in any way to its appropriateness in determining whether an accused student, employee or third party engaged in misconduct.

**46.** Second, it noted that the preponderance of the evidence standard is "the standard of proof established for violations of the civil rights laws."

**47.** The 2011 DCL never explained why this aspect of federal civil rights lawsuits, but no other aspect of civil rights lawsuits (such as the right to discovery, the right to the protections of the rules of evidence, or the right to cross-examine other parties), had to be brought into campus sexual misconduct investigations.

**48.** The 2011 DCL, in fact, "strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing," even though parties to federal civil rights lawsuits have that right.

**49.** The 2011 DCL also warned that "[w]hen OCR finds that a school has not taken prompt and effective steps to respond to sexual harassment or violence, OCR will seek appropriate remedies for both the complainant and the broader student population."

50. The 2011 DCL said that "[w]hen conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding."

### D. The 2014 "Questions and Answers on Title IX"

51. On April 29, 2014, OCR published a document entitled, "Questions and Answers on Title IX and Sexual Violence" ("2014 Q & A").

52. That document, like the 2011 DCL, styled itself as a "significant guidance document."

53. ED did not subject the 2014 Q & A to the Administrative Procedure Act notice-and-comment process before promulgating it.

54. The 2014 Q & A confirmed that OCR considered the schools' use of a preponderance of the evidence standard to be mandatory.

55. In a section entitled "Title IX Procedural Requirements," the 2014 Q & A identifies preponderance of the evidence as "the evidentiary standard that *must* be used … in resolving a complaint[.]" (Emphasis added).

56. The 2014 Q & A confirmed that, in OCR's view, the required use of the preponderance of the evidence standard is grounded in Title IX's requirement that grievance procedures provide for "prompt and equitable resolution" of allegations, saying that "any procedures used for sexual violence complaints, including disciplinary procedures, *must* meet the Title IX requirement of affording a complainant a prompt and equitable resolution … *including applying the preponderance of the evidence standard of review*." (Emphases added.)

57. The 2014 Q & A says that schools have no "flexibility" concerning the evidentiary standard: "*The school must use a preponderance-of-the-evidence (i.e., more likely than not)*

*standard in any Title IX proceedings*, including any factfinding and hearings." (Emphasis added.)

58. The 2014 Q & A also applied all of these same standards to "employee-on-student sexual violence" and "[s]exual harassment."

59. In fact, the 2014 Q & A said, "[a] school's Title IX obligations regarding sexual harassment by employees can, in some instances, be greater than those described in this document and the DCL."

60. The 2014 Q & A continued, '[i]n cases involving a student who meets the legal age of consent in his or her state, there will still be a *strong presumption* that sexual activity between an adult school employee and a student is unwelcome and nonconsensual." (Emphasis added).

61. The 2014 Q & A also warned that "even if a school was not on notice [of misconduct], the school is nonetheless responsible for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence, when the employee engaged in the sexual activity in the context of the employee's provision of aid, benefits, or services to students[.]"

### E.  OCR's Actions to Enforce the 2011 DCL

62. OCR took unprecedented steps to ensure that schools adopted the mandatory requirements imposed by the 2011 DCL and the 2014 Q & A, even though OCR does not have rulemaking authority and even though those requirements were never subjected to notice-and-comment rulemaking under the Administrative Procedure Act and thus do not carry the force of law.

63. OCR's enforcement became so aggressive that most schools adopted even those elements of the 2011 DCL that were not expressly styled as mandatory but for which OCR expressed a clear preference.

64. Just days after issuing the 2014 Q & A, OCR publicly identified colleges and universities it was then investigating for potential violations of their obligation to comply with Title IX in the implementation of prompt and equitable sexual misconduct grievance procedures.

65. When OCR first published its list, there were 55 colleges and universities on it.

66. On June 4, 2014, OCR added JMU to the list.

67. By October 2014, the number of colleges and universities on OCR's public list had grown to 85 schools.

68. In January 2015, the number reached 94 schools.

69. At the time of the 2011 DCL, JMU used a "preponderance of probative, reliable and substantial evidence" standard of proof.

70. Consistent with its dictate that only a preponderance of the evidence standard (and nothing more) could allow for the "prompt and equitable resolution" of sexual misconduct claims, OCR has forced numerous schools that did not immediately comply with the 2011 DCL's mandate to replace more stringent standards with a bare preponderance of the evidence standard.

### F.   The Rescission of the 2011 DCL and 2014 Q & A

71. On September 7, 2017, in a prepared speech, surveying the consequences of the 2011 DCL and the 2014 Q & A, then Secretary of Education Betsy DeVos said, "One person denied due process is one too many," and that "the system established by the prior administration has failed too many students."

72. Secretary DeVos's criticisms were directed at the 2011 DCL and 2014 Q & A.

73. Secretary DeVos explained the "current reality" of Title IX adjudications were "kangaroo courts" where "a school administrator [] will act as the judge and jury."

74. According to Secretary DeVos, "The accused may or may not be told of the allegations before a decision is rendered. If there is a hearing, both the survivor and the accused may or may not be allowed legal representation."

75. Secretary DeVos continued, "Whatever evidence is presented may or may not be shown to all parties. Whatever witnesses—if allowed to be called—may or may not be cross-examined. And Washington dictated that schools must use the lowest standard of proof."

76. Secretary DeVos explained that OCR had "terrified" schools and "run amok" by "weaponiz[ing] the Office of Civil Rights to work against schools and against students."

77. Secretary DeVos said that OCR had "exert[ed] improper pressure upon universities to adopt procedures that do not afford fundamental fairness."

78. Secretary DeVos said, "The failed system imposed policy by political letter, without even the most basic safeguards to test new ideas with those who know this issue all too well."

79. Secretary DeVos declared, "The era of 'rule by letter' is over."

80. On September 22, 2017, Secretary DeVos withdrew the 2011 DCL and the 2014 Q & A.

81. In a press release, the ED said, "The withdrawn documents ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness."

82. Defendant ED, by and through its previous Secretary, has thus admitted that the 2011 DCL and the 2014 Q & A violated the due process rights of individuals involved with college Tile IX proceedings.

83. The University Defendants knew or should have known of Secretary DeVos's conclusions regarding the problems with the 2011 DCL nd 2014 Q & A, including the fact that enforcement of their provisions would likely violate the due process rights of the accused in campus Title IX proceedings.

84. The University Defendants knew or should have known of ED's and Secretary DeVos's conclusions and pronouncements related to the 2011 DCL and 2014 Q & A as announced in September 2017.

85. The University Defendants ignored ED's and Secretary DeVos's September 2017 conclusions and pronouncements, and continued to implement the 2011 DCL and 2014 Q & A requirements through JMU's Title IX procedures.

### G.  The 2017 Replacement Guidance

86. On September 22, 2017 OCR issued a new "Q&A on Campus Sexual Misconduct." ("2017 Q & A").

87. The 2017 Q & A provided a new definition for what constitutes an "equitable" investigation.

88. The 2017 Q & A required, at a minimum: "In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation."

89. The 2017 Q & A said, "Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms. Restricting the ability of either party to discuss the investigation (e.g., through 'gag orders') is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially."

90. The 2017 Q & A said:

Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident. Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.

91. The 2017 Q & A also set forth necessary "procedures" a school should use before finding a party responsible for sexual misconduct.

92. The 2017 Q & A said, "Any process made available to one party in the adjudication procedure should be made equally available to the other party[.]"

93. The 2017 Q & A continued, "Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially."

**94.** The 2017 Q & A also noted that variable standards for differing types of adjudication must be avoided, because "[w]hen a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided."

**95.** The 2017 Q & A did not, however, require that a school use an evidentiary standard more rigorous than a preponderance of the evidence.

**96.** The 2017 Q & A also did not require that schools grant the accused a hearing, or that the school require separation of the investigatory and decision-making functions.

**97.** The University Defendants knew or should have known of the 2017 Q & A, including the requirements related to ensuring the protection of an accused's due process rights in campus Title IX proceedings.

**98.** The University Defendants ignored the 2017 Q & A related to ensuring the protection of an accused's due process rights in campus Title IX prceedings.

**99.** The University Defendants ignored the 2017 Q & A in relation to investigating and pursuing Lese's Title IX allegations againt Plaintiff Reid.

**II.**   **JAMES MADISON UNIVERSITY'S POLICIES RELATED TO ALLEGATIONS OF DISCRIMINATION, HARASSMENT, AND SEXUAL RELATED MISCONDUCT**

    **A.** **Policies Before the 2011 DCL**

**100.** Prior to the 2011 DCL, any complaints of sexual harassment or related misconduct made against faculty at JMU were governed by the 2002 version of Policy #1324, "Discrimination and Harassment Complaint Procedures" ("Policy #1324"). *See* Attachment 1.

**101.** Policy #1324 provided certain procedural safeguards to JMU faculty members to ensure the protection of due process and other constitutional rights.

102.    In general, Policy #1324 allowed for the investigation of complaints alleging "discrimination or harassment against instructional, administrative or professional faculty members."

103.    Policy #1324 required a "complaint" to be both in writing and signed by the "complainant."

104.    Policy #1324 was "applicable"

when a member of the university community ('complainant') believes that he or she has been subjected to harassment or discrimination by an instructional administrative or professional faculty member ('respondent'), provided that at least a substantial portion of the alleged wrongful behavior either occurred on university-controlled, university-leased, or university-owned property, or otherwise had a significant connection to the activities of the university.

105.    The "Policy" enforced by Policy #1324 (e.g., that which was allegedly violated by the named respondent) was defined as follows:

The university is committed to providing faculty members, staff members and students a work and study environment that is free from discrimination or harassment based on protected criteria.  Conduct that constitutes discrimination or harassment is a violation of university policy and is sanctionable.  Any member of the university community who is subjected to discrimination or harassment may bring an internal complaint to attempt to redress the situation.

106.    Policy #1324 defined "discrimination" in relevant part as: "To take an adverse action or provide unequal treatment based on a person's … sex … when such action deprives a person of a privilege or right (such as a benefit, an equitable evaluation, a grade, a position or a promotion), or otherwise adversely affects the person."

107.    Policy#1324 defined "harassment" in relevant part as:

A form of discrimination consisting of unwelcome offensive physical, verbal or written conduct that shows aversion or hostility toward a person on the basis of … sex … in the following situations:

1.  When submitting to or rejecting the conduct is made the basis for a personnel action or an action affecting a student, or a recommendation for

18

a personnel action (such as hiring, promoting or salary adjustment), or an action affecting a student (such as admission or retention), or evaluation (such as promotion, tenure, compensation or work condition adjustment of an employee or grading of a student).

2. When the conduct has the purpose or affect of unreasonably interfering with the performance of an employee or a student.

3. When the conduct creates a hostile, intimidating or offensive learning or working environment.

108. Policy #1324 provided for an informal resolution procedure and a formal complaint process, both of which set forth deadlines and the steps to be followed depending upon how the complainant wished to proceed.

109. In relation to the formal process, Policy #1324 required that a complaint for discrimination or harassment be filed "not later than 60 days **after the last behavior date** by providing the affirmative action officer with a *signed, written document detailing the allegations, naming the respondent and providing as much detail as possible about the charges*." (Emphasis added). The 60-day period could be extended by 30 days "if an informal resolution is in progress."

110. Policy #1324 prohibited the anonymous filing of a complaint.

111. Policy #1324 identified several circumstances under which it did not apply, including but not limited to "[t]hat even if the complainant's allegations are true, the respondent's conduct would not constitute harassment or discrimination *as defined in this policy;*" or "[t]hat the alleged conduct did not occur on university-owned, university-leased or university-controlled property or did not otherwise have a significant connection to the activities of the university;" or "[t]hat the complaint was not timely filed." (Emphasis added).

112.     Policy #1324 described the process to be followed for investigating and adjudicating a formal complaint, including the date by which the "Affirmative Action Officer" ("AAO") was required to provide a written report of findings (no later than 15 days after the complaint commencement date), which report "may also include the AAO's opinion on whether the evidence justifies a preliminary finding … that the respondent violated this policy."

113.     "If the AAO finds that the evidence does not justify such a preliminary finding of violation, the AAO will dismiss the complaint."  The AAO's preliminary finding could be appealed by the complainant to the "appropriate" vice president (e.g., with authority over the respondent) within five days or, if no appeal was timely filed, the complaint was to be dismissed.

114.     If the AAO found that the evidence justified a preliminary finding of violation, the parties would move down a different track, with the respondent first having the right to appeal that finding to the appropriate vice president within five days.  If no appeal was filed, the complaint was referred to "University Complaint Officer" ("UCO"), which was identified as the "individual designated by the AAO to chair a hearing under this policy." The UCO was then responsible for selecting "Hearing Panel" members from the University and providing them with the AAO's report.

115.     The Hearing Panel was made up of three voting members, with at least one from the complainant's classification and one from the respondent's classification.

116.     The complainant and respondent were provided with the names of the Hearing Panel members at least seven days prior to the hearing, and each had the right to use one

peremptory challenge "without having to provide any reason," as well as the right to challenge other members "by providing a valid reason in writing."

117.     The hearing date was to commence within 45 days after the complaint commencement date if possible.

118.     While the hearing was to be conducted in an "informal manner," the parties were afforded certain due process rights and "[i]t is not intended that either party be surprised at the hearing by the appearance or testimony of any witness."

119.     Policy #1324 provided for the filing of prehearing statements, including the names of witnesses and anticipated testimony.

120.     Policy #1324 provided that "[a]lthough attorneys may not participate actively in the hearing, an attorney may accompany and advise either party during the hearing."

121.     The Hearing Panel's standard of proof under Policy #1324 was "a preponderance of probative, reliable and substantial evidence justif[ying] a finding that the respondent had violated the policy prohibiting harassment or discrimination."

122.     If a majority of the Hearing Panel members determined "by a preponderance of probative, reliable and substantial evidence that the respondent violated this policy, the Hearing Panel shall then determine what sanction should be recommended."

123.     The "severity" of the sanction was to be based on the Hearing Panel's assessment of the nature of the violation, with the existence of "aggravating circumstances" justifying a more severe sanction. "Recommended sanctions must be approved unanimously by Hearing Panel members."

124.     The Hearing Panel was required to issue written findings and recommendations "including the reasons for the decisions" within ten days after the hearing.  Such written

findings and recommendations were to be provided to the parties, the UCO, and appropriate vice-president.

125.     The respondent had the right to appeal a finding of harassment or discrimination, or the severity of the sanction imposed, to the appropriate vice president within ten days. The grounds for such appeal were limited to the following:  (1) new evidence not reasonably available to the respondent until after the hearing; or (2) the respondent was denied due process.

126.     The vice president had four options available:  (1) affirm the findings of the Hearing Panel; (2) affirm the findings of the Hearing Panel but modify the recommended sanctions; (3) direct that a new hearing take place (with a new UCO and Hearing Panel); or (4) reverse the Hearing Panel's decision and terminate the complaint (which decision was not appealable).

127.     The respondent had the right to appeal the vice president's adverse decision to the President.  The respondent also had certain rights under the JMU Faculty Handbook.

**B.  JMU Response to 2011 DCL and 2014 Q & A**

128.     Through the 2011 DCL and the 2014 Q & A, Defendant ED coerced Defendant JMU to revise its campus disciplinary policies, and its policies for adjudicating complaints of sexual discrimination, sexual harassment, and sexual misconduct.

129.     Defendant JMU cited to the 2011 DCL as a reason that it amended its Policy #1324 and as support for adopting Policy #1340.

130.     Through its aggressive enforcement actions against schools that chose to provide appropriate and necessary constitutional procedural protections in campus disciplinary

proceedings, Defendant ED coerced the University Defendants to remove such due process

protections to avoid facing a Title IX enforcement action and the loss of federal funding.

131.     Defendant JMU amended/adopted these policies in part to avoid an enforcement

action by Defendant ED.

132.     Defendant JMU denied Plaintiff Reid her due process rights as protected by the

United States and Virginia Constitutions in part to avoid being subject to an enforcement

action by ED.

1.   2012 Amendments to Policy #1324

**133.**     In August 2012, and in response to the 2011 DCL, JMU revised Policy #1324

(referred to below as the "2012 Policy #1324"). *See* Attachment 2.

**134.**     The 2012 Policy #1324 modified several of the procedural protections that had been

previously afforded to respondents who had been accused of discrimination or harassment.

**135.**     The 2012 Policy #1324 added the positions of a "Title IX Coordinator" and a "Title

IX Officer."

**136.**     The "applicability" of the 2012 Policy #1324 was broadened to include conduct

that "had a significant connection to or effect on … the learning or working environment

of the complainant."

**137.**     The "Policy" enforced by the 2012 Policy #1324 (e.g., that which was allegedly

violated by a particular respondent) was defined as follows:

The university is committed to providing a work and learning environment that is
free from discrimination or harassment based on protected criteria.  Conduct that
constitutes discrimination or harassment is a violation of university policy and is
sanctionable.

This policy prohibits discrimination against an individual on the basis of … sex,
[or] sexual orientation….  It applies in the employment relationship.

138.     The 2012 Policy #1324 provided that "[a]ny member of the university community or visitor who is subjected to discrimination or harassment by an employee, affiliate or visitor may bring a complaint under this policy to attempt to redress the situation."

139.     The 2012 Policy #1324 defined "discrimination" in relevant part as: "To take an adverse action or provide unequal treatment based on a person's … sex [or] sexual orientation … when such action deprives a person of a privilege or right (such as a benefit, an equitable evaluation, a grade, a position or a promotion), or otherwise adversely affects the person."

140.     The 2012 Policy #1324 defined "harassment" in relevant part as:

A form of discrimination consisting of unwelcome or offensive physical, verbal or written conduct that shows aversion or hostility toward a person on the basis of … sex [or] sexual orientation … in the following situations:

1. When submitting to or rejecting the conduct is made the basis for a personnel action or the recommendation for a personnel action (such as hiring, promoting or salary adjustment), or an action or a recommendation for an action affecting a student (such as admission or retention), or evaluation (such as promotion, tenure, compensation or work condition adjustment of an employee or grading of a student).

2. When the conduct has the purpose or affect of unreasonably interfering with the performance of an employee or a student.

3. When the conduct creates a hostile, intimidating or offensive learning or working environment.

141.     The 2012 Policy #1324 retained the requirement that a complainant would need to file a "signed and written document" with the Title IX Office in order to pursue a "formal complaint."

142.     The 2012 Policy #1324 prohibited the filing of anonymous complaints.

143.     The "Complaint Commencement Date" was defined as "[t]he date on which the complainant provides the Title IX Officer with the written and signed complaint."

144.      The 2012 Policy #1324 provided for an informal resolution procedure and a formal complaint process, both of which set forth deadlines and the steps to be followed depending upon how the complainant wished to proceed.

145.       The 2012 Policy #1324 recommended the complainant to contact the Title IX Office no later than 30 days "after the last behavior date," while also extending the deadline for the filing of a formal complaint.  According to the Policy:

Failure to make *a timely report* to the Title IX Officer may impede the university's ability to effectively investigate the charge, but such failure will not prohibit the complainant from filing a formal complaint, *as long as such complaint is timely filed under 6.2.1.*  (Emphasis added).

146.      Section 6.2.1. provided the deadlines for filing a formal complaint:

The formal complaint *must be filed* by the complainant *not later than 180 days after the last date of discriminatory or harassing behavior* by providing the Title IX Officer with a signed, written document detailing the allegations, naming the respondent and providing as much detail as possible about the charges.  The Title IX officer *may extend this period to no more than 300 days* if an informal resolution procedure under 6.1.8 is in progress.  (Emphasis added).

147.      The 2012 Policy #1324 required the Title IX Officer to confirm the "complaint commencement date with the complainant in writing and will notify the respondent…."

148.      The 2012 Policy #1324 required the Title IX Officer to supply a copy of the complaint to the respondent early in the process.

149.      The 2012 Policy #1324 required the Title IX Officer to first make a determination as to "whether this policy applies" before proceeding further.  The Title IX Officer was also required to "dismiss a complaint if the policy does not apply…."  Any such dismissal was deemed final and not subject to appeal.

150.      The 2012 Policy #1324 identified several circumstances under which it did not apply, including but not limited to "[t]hat even if the complainant's allegations are true, the

respondent's conduct would not constitute harassment or discrimination *as defined in this policy*"; or "[t]hat the alleged conduct did not occur on university-owned, university-leased or university-controlled property or did not otherwise have a significant connection to the activities of the university or the working or learning environment for the complainant;" or *"[t]hat the complaint was not timely filed*[.]"  (Emphasis added).

151.    The 2012 Policy #1324 identified the Title IX Officer as the person initially responsible for conducting an investigation of the complaint, but only if the Officer first determined that the policy applied to the allegations being made.

152.    The 2012 Policy #1324 required the Title IX Officer to provide a "confidential written report" of recommendations and findings to the respondent's supervisor "[n]ot later than 60 days after the complaint commencement date… ."

153.    The 2012 Policy #1324 further provided that "the Title IX Officer may also report to the appropriate office the Title IX Officer's opinion on whether the evidence justifies a preliminary finding by the Title IX Officer that the respondent violated this policy and whether the respondent should be charged with misconduct under the appropriate disciplinary procedures if any."

154.    Any "preliminary finding" by the Title IX Officer was to be based on a "preponderance of the evidence" standard.  The Title IX Officer's "preliminary finding" was not binding on the fact-finders in any subsequent misconduct hearing or procedure.

155.    If the Title IX Officer found by a preponderance of the evidence that the evidence did not justify such a preliminary finding, the Officer would dismiss the complaint and send notice of such dismissal to the complainant and respondent.  The complainant could

appeal this decision to the Director of Equal Opportunity ("DEO") within five days. If no appeal was timely filed, the complaint would be dismissed.

156.     If an appeal was timely filed, the DEO would then decide whether to refer the case "to the appropriate officer" for further proceedings or uphold the dismissal. Neither decision was subject to appeal.

157.     If the Title IX Officer found that the evidence justified a preliminary finding of violation, the Title IX Officer would notify the DEO, the appropriate vice president, the complainant and the respondent that he or she was referring the complaint "to the appropriate officer" for further proceedings.

158.     The participants in any proceeding under the 2012 Policy #1324 were required to maintain confidentiality.

159.     Staff members, employees, and faculty members could be disciplined or discharged for violating the 2012 Policy #1324.

160.     The 2012 Policy #1324 allowed the complainant and the respondent "to obtain advice of private counsel concerning this policy and the procedures in it. However, *the role of counsel is purely advisory in this policy and procedure, and, absent exceptional circumstances attorneys are not to be active participants in the process*." The DEO, the administrators involved in the decision, and the committees involved all had access to advisors from the JMU Legal Services Office.

161.     In terms of "responsibilities," the 2012 Policy #1324 provided that the University Health Center ("UHC") was tasked with accepting and investigating formal complaints by students, determining the applicability of this policy to specific complaints and coordinating with the DEO on the processing of those complaints."

27

162.     The 2012 Policy #1324 provided that "[s]anctions will be commensurate with the severity and/or frequency of the offense and may include termination of employment, removal of affiliate status, exclusion from future learning or working opportunities at the university and/or issuance of a no-trespass notice."

163.     Any such "sanctions" could not be imposed prior to the completion of the process, as prior to that time there would be no "offense" to judge.

164.     JMU's 2012 Policy #1324 "sets out the University's commitment to providing a workplace and learning environment free from illegal discrimination and harassment."

165.     JMU's 2012 Policy #1324 governed conduct that took place during the term when such policy was in effect.

166.     JMU's 2012 Policy #1324 governed the conduct and rights of University students, employees and faculty for all activities that took place during the November 2015 to September 2016 timeperiod in relation to claims of Title IX violation.

167.     "Any member of the university community … who is subjected to discrimination or harassment" by an employee could bring a complaint under the 2012 Policy #1324 to redress the situation.

168.     Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq*.) provided the statutory authority and foundation for JMU's 2012 Policy #1324.

169.     JMU's 2012 Policy #1324 provided that "[c]onduct that constitutes discrimination or harassment is a violation of university policy and is sanctionable."

170.     JMU's 2012 Policy #1324 focused upon the conduct of the accused, with the purpose of the "Procedures" set forth therein being to determine whether such conduct violated the Policy as defined.

171.     By focusing upon the "conduct" of the respondent, any claim accusing someone of having engaged in Title IX discrimination or harassment while the 2012 Policy #1324 was in place must be governed by that policy, as it provides the definitional framework for determining whether someone violated University "policy" and was subject to being sanctioned.

172.     If the respondent's conduct in question did not violate that policy, the University Defendants were required to dismiss the complaint, and the accused was not subject to and could not be investigated or sanctioned

2.     2014-2015 Task Force

173.     In August 2014, and in further response to the 2011 DCL, JMU created a fourteen-member "Title IX Task Force," originally charging it with "conducting a comprehensive review of university policies and procedures designed to prevent *and adjudicate* cases of sexual assault."  (Emphasis added).

174.     JMU's Title IX Task Force reviewed a variety of documents to "assure university compliance."  Such materials included the following documents issued by the ED:

   a.   "The report of The White House Task Force to Protect Students from Sexual Assault" (issued in April 2014);

   b.   "The guidelines issued by the Office for Civil Rights at the Department of Education"; and

   c.   "The OCR's 'Dear Colleague' letter."

175.     "As a result of the [Task Force's] comprehensive review, university policy 1324, 'Discrimination and Sexual Misconduct,' [underwent] significant revisions."

176.     The Title IX Task Force continued its activities throughout 2015, reporting that

they had undertaken the following actions (among others):

   a.   "Reviewed the new guidance documents from the Office of Civil Rights *for*
        *compliance*."  (Emphasis added).

   b.   "Created new Policy 1340, Title IX, incorporating all current laws and guidance."

   c.   "Expanded the number of Title IX officers."

### 3.     Creation of "Sexual Misconduct" Policy #1340

177.     ***In September 2016***, and as a result of the Title IX Task Force's work, JMU adopted

an entirely new Policy #1340 entitled "Sexual Harassment and Sexual Misconduct"

("Policy #1340").  *See* Attachment 3.

178.     ***In January 2018,[1]*** JMU issued a newly-revised version of Policy #1340 governing

"Sexual Misconduct." *See* Attachment 4.  It included sections on "purpose," "authority,"

"definitions," "applicability," and "policy."   It likewise included a description of the

procedures for dealing with complaints.

179.     The "Purpose" of Policy #1340 was stated as follows:

The University is committed to providing a work and learning environment that is
free from discrimination based on sex, sexual orientation, gender and gender
identity.  One form of sex discrimination is sexual misconduct.  This policy sets out
the university's commitment to providing a workplace and learning environment
free from all forms of illegal sex discrimination, including but not limited to sexual
harassment, sexual misconduct, sexual assault and sexual violence (hereafter in this
policy referred to in the aggregate as 'sexual misconduct').   It also provides
procedures for university employees, students, affiliates and visitors to file reports
and/or formal complaints alleging sexual misconduct against any student,
employee, affiliate or visitor whose sexual misconduct interferes with the reporter's
workplace or learning environment.

180.     The "Applicability" of Policy #1340 provides in relevant part:

---

[1] As relevant here, the 2016 and 2018 versions of Policy #1340 are largely the same.  Any relevant differences
between the 2016 and 2018 Policy #1340 are noted below.

This policy applies when a member of the university community reasonably believes that he/she or another university community member has been subjected to sexual misconduct by … an employee… .

All acts of sexual misconduct are covered by the terms of this policy, provided that at least a substantial portion of the alleged wrongful behavior either occurred on university-controlled, university-leased or university-owned property or otherwise had a significant connection to or effect on the activities of the university or the learning or working environment for the reporter.  Off-campus incidents that cause continuing effects on campus are specifically covered by this policy.

181.    According to Section 5.2 of Policy #1340 entitled "Sexual Misconduct": "The university will not tolerate sexual misconduct against any member of the university community by a university employee, student, affiliate or visitor.  Conduct by any member of the university community or visitor that constitutes sexual misconduct is a violation of university policy and is sanctionable."

182.    "Sexual misconduct" is defined ". . . to include[] sexual assault, sexual violence, sexual harassment, dating violence, domestic violence, relational violence, sexual exploitation, stalking, and all other forms of misconduct on the basis of or because of a reporter's sex, sexual orientation, gender, or gender identity"

183.    The adoption of Policy #1340 in September 2016 was the first time that JMU sought to equate its definition of a "nonconsensual" relationship with "sexual misconduct" and to incorporate such concepts into its Title IX policies and procedures.

184.    Policy #1340 defined a "consensual relationship" as "[a] relationship between adult members of the university community which is freely and mutually entered into and continued, and is not coerced, influenced  by an unfair power differential or the subject of any type of inappropriate or undue pressure or force."

185.    Section 5.6 of Policy #1340 sought to describe the University's policy related to "consensual" and "nonconsensual" relationships:

31

Genuinely consensual relationships which are not coerced, influenced by an unfair power differential or the subject of any type of inappropriate or undue pressure or force between adult members of the university community are not prohibited.  A sexual relationship between members of the university community to which one party does not or cannot consent is a form of sexual misconduct.  A sexual relationship between members of the university community is prohibited if it is influenced by any form of fear or coercion, such that it causes one party to believe that he/she must submit to the unwelcome sexual conduct in order to accept or continue employment, achieve an employment or educational benefit, or participate in a program or activity or to remain safe and secure.  In a sexual relationship between individuals where a power differential would imply or raise the inference of exploitation or raise the inference that an educational or employment decision will be based on whether or not there is submission to coerced sexual conduct, the relationship is prohibited.  Examples would include an instructional faculty member and a student enrolled in his/her class or under his/her supervision; employees who are a supervisor and a subordinate; a coach and a member of the team he/she coaches; or any other relationship where one party has the opportunity to pressure or force the relationship on the other.  Any sexual relationship between an adult and a minor or where one party is unable to give effective and informed consent is presumed to be coerced and not consensual, and is prohibited.

186.     Policy #1340 defined "student" as "[a]ny person enrolled in a class at the university, including undergraduate students, graduate students and those students enrolled in non-credit courses."

187.     Policy #1340, adopted in September 2016, was the first time that JMU introduced the concepts of "consensual" and "nonconsensual" relationships, the first effort by the University to define such terms, and the first time that the University Defendants informed faculty of how their conduct would be judged pursuant thereto.

188.     Policy #1340 provided that "[a]ll responsible employees *must* disclose any reports of sexual misconduct, including reports that they receive within the course of their employment, to a Title IX Officer."  (Emphasis added).

189.     Policy #1340 defined a "responsible employee" as being "[a] university employee who has the duty to disclose *all* reports of sexual misconduct to a Title IX Officer.  *All* university employees … are responsible employees."  (Emphasis added).

190.     Policy #1340 identified the "Title IX Coordinator" as the "individual designated by the university to coordinate the institution's compliance with Title IX."  The Title IX Coordinator "oversees the university's response to Title IX reports and formal complaints, and identifies and addresses any patterns or systemic problems revealed by such reports and formal complaints."

191.     The "Title IX Officers" are those "officials within the university charged with receiving, investigating and processing reports and formal complaints under this policy."

192.     Policy #1340 defined a "formal complaint" as "[t]he signed and written document used to file a formal complaint of sexual misconduct under this policy.  A report may be communicated orally, but a formal complaint must be in writing and signed by the reporter."

193.     The "Formal Complaint Process" was commenced by the filing of the "formal complaint" (in writing and signed by the reporter) pursuant to Policy #1340. "A formal complaint may be filed by the reporter by providing the Title IX Officer with a signed, written document detailing the allegations, naming the respondent and providing as much detail as possible about the charges."

194.     Policy #1340 abolished all limitation periods and deadlines by which formal complaints had to be filed.

195.     According to the 2016 version of Policy #1340:  "The formal complaint should be filed as soon as possible after the last date of discriminatory or harassing behavior.  *There is no time limit for filing a formal complaint under this policy*, but the university must be able to **investigate** and address the allegations."  (Emphasis added).

196.     The 2018 version of Policy #1340 modified the 2016 version of Policy #1340 in relation to the University's role in handling Title IX allegations.  According to the 2018 version of Policy #1340:  "The formal complaint should be filed as soon as possible after the last date of discriminatory or harassing behavior.  *There is no time limit for filing a formal complaint under this policy*, but the university must be able to **collect statements** and address the allegations."  (Emphasis added).

197.     Although Policy #1340 provided no specific limitation period, it still imposed an affirmative obligation on the Title IX office to ensure that the complaint was timely:  "The Title IX Officer *will determine* whether the formal complaint is filed within a reasonable amount of time from the date of the last date of discriminatory or harassing behavior."

198.     The 2016 version of Policy #1340 stated that a complaint filed in time to allow an investigation into the allegations will be considered timely, but a formal complaint filed after so much time has elapsed that no investigation is feasible, will be considered untimely and will be dismissed.  A dismissal of a formal complaint as untimely was final and not appealable.

199.     The 2018 version of Policy #1340 stated that a complaint filed in time to allow statements to be collected related to the allegations would be considered timely, but a formal complaint filed after so much time elapsed that statement collection is not feasible, will be considered untimely and be dismissed.  A dismissal of a formal complaint as untimely was final and not appealable.

200.     Policy #1340 mandated the Title IX Officer to first make a determination "[u]pon receipt of a report" as to "whether this policy applies and [to] inform the reporter … if the policy does not apply."  The Title IX Officer was required to dismiss the complaint if the

34

policy did not apply. "A decision that the policy does not apply is final, and is not appealable."

201.       Policy #1340 provided examples of the circumstances under which it did not apply, including but not limited to "[t]hat the respondent's alleged conduct as reported would not constitute sexual misconduct as defined in this policy;" or "[t]hat a substantial portion of the alleged conduct did not occur on university-owned, university-leased or university-controlled property or did not otherwise have a significant connection to the activities of the university or effect on the reporter's working or learning environment at the university."

202.       The list of reasons for which the Title IX Officer could determine that Policy #1340 did not apply was not exclusive and other reasons could form the basis for that decision.

203.       The timeliness of the complaint was no longer one of the enumerated bases for dismissing the complaint, except in those circumstances where so much time had elapsed that no investigation was feasible (2016) or it was not feasible to collect statements (2018) (as described in Section 6.6.3).

204.       If the Title IX Officer determined that the policy applied to a particular allegation, the Officer was required to inform the reporter of the options for filing a formal complaint and sign a form related to such options.

205.       The options included pursuing a formal complaint under Policy #1340 or taking no action.

206.       The decision to file a formal complaint under the 2016 version of Policy #1340 meant that the Title IX Officer would, "if possible," *investigate the complaint* and provide a "copy of the results" to the Title IX Coordinator.  It was then the Title IX Coordinator's

responsibility to "convene a hearing panel for a determination on the formal complaint." A copy of "the results" of that investigation were to be provided to the reporter and the respondent.

207.    The decision to file a formal complaint under the 2018 version of Policy #1340 meant that the Title IX Officer would, if possible, "*collect statements*" related to the complaint and provide a copy of the statements to the Title IX Coordinator.  It was then the Title IX Coordinator's responsibility to convene a hearing panel for a determination on the formal complaint for faculty members.  A copy of "the collected statements" were to be provided to the reporter and the respondent.

208.    Section 6.6 of Policy #1340 describes the process for dealing with complaints.  The formal process was commenced with the filing of "a signed, written document *detailing the allegations*, naming the respondent and *providing as much detail as possible about the charges*."  (Emphasis added).

209.    According to the 2016 version of Policy #1340, "[i]f the Title IX Officer determines that this policy applies, and the reporter opts to file a formal complaint under this policy, the Title IX Officer *will determine* if there is sufficient information to conduct an investigation."  (Emphasis added).  If not, the Title IX Officer would notify the reporter that no investigation would be done.

210.    According to the 2018 version of Policy #1340, "[i]f the Title IX Officer determines that this policy applies, and the reporter opts to file a formal complaint under this policy, the Title IX Officer *will determine* if there is sufficient information to collect statements."  (Emphasis added).  If not, the Title IX Officer would notify the reporter that statements would not be collected.

36

211.    The 2016 version of Policy #1340 provided that "[t]he role of the Title IX Officer is to be an impartial investigator" and to treat both the reporter and respondent fairly "and to compile the evidence presented by both sides or found during the investigation *to report* the results to the appropriate office for determination."  (Emphasis added).

212.    The 2016 version of Policy #1340 stated that "[t]he investigation by the Title IX Officer shall be prompt, adequate, reliable and impartial, and it *shall* include equal opportunity for both the reporter and the respondent to present appropriate information for the investigation."  (Emphasis added).  "Any written statements or other documents produced by either party will be shared with the other party."

213.    Section 6.6.8.1 of the 2016 version of Policy #1340 contemplated that the Title IX Officer shall provide an "investigation report concerning an alleged violation of this policy by an employee… ."  The Title IX Coordinator was then required to assemble a hearing panel within ten (10) days and refer the case to it.  The procedure followed by the hearing panel is set out in Section 6.6.8 of the 2016 Policy #1340.

214.    The 2018 version of Policy #1340 provided that "[t]he role of the Title IX Officer is to collect statements in an impartial manner, to treat both the reporter and respondent fairly, and to compile the statements presented by both sides or found during the collection process to the appropriate office for determination."

215.    The 2018 version of Policy #1340 stated that "[t]he statement collection process by the Title IX Officer shall be prompt, adequate, reliable and impartial, and it *shall* include equal opportunity for both the reporter and the respondent to present appropriate information for the statement collection process."  (Emphasis added).  "The parties will be

notified that any written statements and other documents produced by either party will be shared with the other party."

216.     The complaint process against a faculty member required the Title IX Officer to make a "preliminary finding concerning a violation of this policy."  Such "preliminary finding" was to be provided to the Title IX Coordinator, who was required to assemble a hearing panel within 10 days thereafter and refer the case to the hearing panel.

217.     The hearing panel was to convene within 5 days thereafter, unless the University was officially closed or for "good cause shown" by a party for an extension.

218.     The hearing panel was to be made up of 3 members with 1 alternate.

219.     Policy #1340 did not require the accuser/reporter to attend the hearing.

220.     Policy #1340 did not require the accuser/reporter to be subject to questioning by the hearing panel.

221.     Policy #1340 did not require the accuser/reporter to be subject to cross-examination by the respondent.

222.     Policy #1340 did not allow the accused/respondent to question the accuser/reporter about any of the allegations made.

223.     Policy #1340 did not allow the accused/respondent in any such proceeding to cross-examine the accuser/reporter:

> In the hearing, neither party is required to be present.  If a party is not present, he/she may submit a written statement.  If the parties are present and testify, neither the reporter nor the respondent shall be allowed to cross-examine the other party directly, but shall propose questions through the chair of the hearing panel. Either party may opt to participate via remote access to the hearing, through audio or video conferencing options.  Such remote access must be requested far enough in advance to allow the hearing panel chair to make arrangements for the appropriate equipment.

224.     Section 6.6.8.6 of Policy #1340 provided that "[e]qual opportunity shall be given to the reporter and the respondent to present testimony, witnesses and evidence.  Both the reporter and respondent shall have timely access to documents and information considered by the hearing panel."

225.     Policy #1340 allowed the parties to have "access to advice of legal counsel and may have legal counsel or other advisor present during the hearing."  Such legal counsel could not address the hearing panel or participate in the proceedings.  The role of any support person or legal counsel "is purely advisory in this procedure and attorneys or other support persons are not to be active participants in the process."

226.     The Title IX Coordinator, the administrators involved with decision, and any committee operating under the policy and procedures, had full access to advice from the Legal Services Office of the University.

227.     Policy #1340 provided that "information concerning the reporter's or respondent's prior or subsequent sexual history shall not be relevant unless it is the subject of a prior civil, criminal or administrative determination."

228.     "All testimony given before the hearing panel was to be audio-recorded."  Such recording is held by the office of the Title IX Coordinator.

229.     Policy #1340 provided that "[a]ll persons performing responsibilities under this policy will respect and maintain the strict confidentiality of all relevant documents and deliberations."  The privacy of the parties was supposed to be protected.

230.     The Policy reiterated the confidentiality requirements in section 6.7.3: "All participants in all proceedings under this policy will observe confidentiality to the extent reasonably possible."

231.     The "evidentiary standard" applied pursuant to Policy #1340 was the "preponderance of the evidence."

232.     Policy #1340 placed the burden of proof on the accuser/reporter, not the accused/respondent.  "The respondent is presumed to be not responsible unless *sufficient evidence* is presented to prove a violation *of the policy* has occurred."  (Emphasis added).

233.     The deliberations of the hearing panel were not to be recorded.  The deliberations were to be confidential.  The decision of the hearing panel was by majority vote.

234.     "*Only if* the hearing panel finds that the respondent has violated *the policy* will the panel consider potential sanctions against the respondent."  (Emphasis added).

235.     Within five days of the conclusion of the hearing, the chair of the hearing panel was to communicate its decision and recommendations to the Title IX Coordinator.  Within ten days thereafter, the respondent's associate or assistant vice president or dean was to send the written decision in the case to the reporter and respondent, with copies to the Title IX Coordinator.

236.     Either party had the right to appeal the decision within five days.

237.     If an appeal was timely filed, "the vice president will make a decision on the appeal within 5 days of the final submission, based on the written record and a preponderance of the evidence."  The vice president could uphold the decision below, reject it or modify it.  "The decision of the vice president is final, and may not be appealed."

238.     Policy #1340 "does not apply to genuinely consensual relationships between adult members of the university community."

239.     Policy #1340 had not yet been adopted and was not in effect during the relevant time frame *sub judice*—that period of time between November 2015 and May 2016.

### III.     PLAINITFF REID'S EMPLOYMENT WITH JMU AND RELATIONSHIP WITH ACCUSER/REPORTER LESE

240.       Plaintiff Alyssa Reid holds a Masters Degree in Fine Arts degree in Communication, having graduated from Minnesota State University, Mankato, in 2012.

241.       On June 21, 2012 JMU sent Plaintiff Reid a letter offering her a position on the faculty of the University in the School of Communication Studies. She was also offered the position of Assistant Director of Individual Events to assist with coaching, tournament travel, and community outreach.

242.       Plaintiff Reid began working as the Assistant Director of JMU's "Individual Events Team" in the summer of 2012.

243.       Plaintiff Reid's duties as the Assistant Director of the Team involved organizing travel logistics, administering finances, mentoring, editing speeches, working with students on their performance skills and lecturing.

244.       Plaintiff Reid also served in a variety of service capacities for the School of Communication Studies, as well as for regional and national forensics organizations.

245.       Plaintiff Reid was awarded the JMU "Dolley Award" in 2017, which is a student-nominated award for Best Campus Advisor.

246.       While at JMU Plaintiff Reid was a dedicated teacher and advocate on behalf of her students. For her, teaching extended well beyond being merely a vocation and into an intrinsic aspect of her identity.

247.       Plaintiff Reid had a protectable property interest in her continued employment with JMU, being a full-time faculty member, and entitled to the protections afforded by JMU's disciplinary procedures.

248.     Plaintiff Reid had a protectable contract interest in her continued employment with JMU as a full-time faculty member, and entitled to the protections afforded by JMU's disciplinary procedures.

249.     Plaintiff Reid first met Kathryn "Katie" Lese, the accuser or "reporter" in the underlying JMU proceedings, in 2012.  Lese was an undergraduate at that time and took the first SCOM 242: Presentation Speaking class that Plaintiff Reid taught as a Professor at JMU in the spring of 2013.

250.     Lese graduated from JMU with a Bachelors Degree in the spring of 2014, and at that point had earned a graduate teaching position with the James Madison Forensics Team.

251.     Plaintiff Reid and Lese were "best friends" by the time that the latter graduated from JMU in 2014, spending a substantial amount of time together both personally and professionally.  They had no romantic or sexual relationship throughout that time.

252.     In the fall of 2014 Lese was assigned as a graduate student to the "Individual Events Team."

253.     Neither Plaintiff Reid nor Lee Mayfield (the Director of the Individual Events Team) had any supervisory responsibilities or authority over Lese while she was a graduate student, as those duties fell under the purview of the Director of the Graduate Program for Communication Studies.

254.     Plaintiff Reid and Lese, in their respective roles with the "Individual Events Team," were colleagues and co-coaches with largely similar responsibilities.

255.     Plaintiff Reid did not have supervisory responsibilities or any other type of authority over Lese in her graduate program.

42

256.    Plaintiff Reid was not a member of the Graduate Department during the period of time that Lese was in the graduate program.

257.    Plaintiff Reid was not on a thesis committee and did not teach any graduate courses during the period of time that Lese was in the graduate program.

258.    Plaintiff Reid did not have any decision-making authority over graduate-student travel, including the travel of Lese.

259.    Plaintiff Reid did not have any decision-making authority over whether (or how much) the graduate students, including Lese, were paid for their work.

260.    Plaintiff Reid did not have any decision-making authority over whether Lese did or did not receive any scholarships.

261.    Plaintiff Reid did not have any decision-making authority regarding what students would be assigned to the Department as graduate assistants.

262.    Plaintiff Reid did not have any faculty involvement with the graduate program that Lese was in, so she had no influence over academic matters.

263.    There was no "power differential" between Plaintiff Reid (in her role as Assistant Director) and Lese (in her role as a graduate student).

264.    Both Plaintiff Reid and Lese were in committed relationships with other people throughout this period up to and including early November 2015, by which time they had been colleagues for over a year.

265.    In October 2015, Plaintiff Reid and Lese traveled as coaches to a forensics tournament in New Jersey with the JMU team.  Lese had been a graduate teaching assistant for over one year by that point.

266.    Lese invited Plaintiff Reid to her hotel room for a drink as she had packed a bottle of Svedka Citrus Vodka.  Lese informed Plaintiff Reid at that time of her sexuality and that she was a lesbian (although she was then in a long-term relationship with a man).

267.    It was during the October 2015 discussion in Lese's hotel room that Lese first professed her love for Plaintiff Reid, informing her that she had been in love with her for over a year.

268.    It was during the October 2015 discussion in Lese's hotel room that Lese told Plaintiff Reid that she had been attempting to figure out how to pursue her for months.

269.    Over the following month, Lese continued to pursue Plaintiff Reid, initiating discussions about sex, discussing having sex with her on her desk, and graphically describing other intimate details about her sexual attraction to Plaintiff Reid.

270.    Plaintiff Reid resisted Lese's pursuit, expressing caution and voicing concern about her efforts to move their friendship into a different type of relationship, as she did not want to ruin their friendship and she was already in a committed relationship (as was Lese).

271.    Plaintiff Reid and Lese had their first sexual encounter in November 2015 while they attended a national conference in Las Vegas.  Lese invited Plaintiff Reid to her hotel room and, upon entering the elevator, physically pressed herself against Plaintiff Reid and forcefully kissed her.  Lese later often bragged to Plaintiff Reid and others about the fact that she was the one who had "made the first move."

272.    Lese was the pursuer in initiating the relationship with Plaintiff Reid.

273.    Lese also informed Plaintiff Reid at the time that she hoped what had happened between them "didn't stay in Vegas," making clear that she wanted to continue their relationship after they returned home to Virginia following the trip.

274.     Plaintiff Reid and Lese mutually agreed to break up with their respective partners and enter into a monogamous relationship with each other.

275.     Lese reported to Plaintiff Reid in November 2015 that she never had any romantic or sexual feelings for her while she was Plaintiff Reid's student.

276.     Plaintiff Reid and Lese mutually agreed to keep their relationship private, so as to avoid impacting the team in any way or to spark interdepartmental gossip.

277.     Plaintiff Reid and Lese remained in a monogamous and romantic relationship up to and through May, 2016 when Lese completed her graduate program and obtained her graduate degree in Health Communication.

278.     JMU hired Lese as a full-time employee in the University Program Board as the Coordinator of Organization Develooment beginning in  June 2016.

279.     Plaintiff Reid and Lese continued their relationship well beyond May 2016, staying together up to and through January 2018.

280.     In May 2016 someone lodged an anonymous Title IX allegation against Plaintiff Reid with regard to her relationship with Lese.

281.     No one from the University, including the Title IX Department, notified Plaintiff Reid of such allegation at the time that it was lodged.

282.     Plaintiff Reid was later informed by her Department Chair that the Title IX office had investigated the allegation and concluded that the environment on the team was not problematic.

283.     Subsequent to that investigation, the Department Chair informed Plaintiff Reid that there were no problems associated with her personal relationship with Lese because she *was not* Lese's direct supervisor.

284.    Lese was upset that someone had alleged that there was anything improper in her relationship with Plaintiff Reid.  She did not believe that their relationship was the University's business.

285.    Plaintiff Reid and Lese moved in together in a house purchased by Plaintiff Reid in the summer of 2017.

286.    Plaintiff Reid and Lese ended their relationship in February 2018.

287.    Lese did not take that break-up well, thereafter stalking Plaintiff Reid, sending her abusive and threatening text messages, policing Plaintiff Reid's social media, and harassing her.

288.    Plaintiff Reid reported Lese's harassment and irrational behavior to the University Defendants during the course of the Title IX investigation and proceeding that is the subject of this lawsuit.

289.    Plaintiff Reid provided the University Defendants with numerous examples of Lese's misconduct, aggressiveness, manipulation, control, hostility, viciousness, jealousy, erratic behavior and threats to ruin her.

290.    At no point did the Title IX Office or Coordinator provide advice about or assist Plaintiff Reid with pursuing a Title IX complaint against Lese or otherwise help her to file a Title IX complaint.

291.    Plaintiff Reid provided the University Defendants with contemporaneous information that corroborated her concerns about Lese's behavior and motivations.  As one example, and prior to Lese filing her Title IX allegations, Plaintiff Reid reported to a JMU colleague that Lese was trying to ruin her.

292.      Lese's action in pursuing a Title IX action against Plaintiff Reid was simply one more step in her ongoing crusade to destroy Plaintiff Reid's life and career.  This fact was clear from the information submitted during the JMU Title IX proceedings against Plaintiff Reid.

293.      The University Defendants knew or should have known that Lese's Title IX action against Plaintiff Reid was retaliatory, baseless, and filed for improper reasons.

294.      The University Defendants knew or should have known that Lese failed to state a valid Title IX claim against Plaintiff Reid.

295.      The University Defendants knew or should have known that Lese's allegations against Plaintiff Reid did not comply with or meet the requirements of JMU's policies and procedures and were inadequate for lodging a Title IX complaint.

296.      The University Defendants knew or should have known that Lese's Title IX complaint was not timely filed.

297.      The University Defendants ignored the evidence that Plaintiff Reid presented.

298.      The University Defendants failed to protect Plaintiff Reid from Lese's retaliatory, aggressive and improper harassment.

IV. **TITLE IX PROCEEDINGS AGAINST PLAINTIFF REID**

      A.  **Filing with Title IX Office**

299.      On December 4, 2018 Lese sent an email message to Defendant Sirocky-Meck, JMU's Title IX Coordinator, with an attached "Title IX Statement" that was both unsigned and undated.  *See* Attachment 5.

300.      Lese's email message and attached "Title IX Statement" were filed with Defendant JMU over 3 years after Plaintiff Reid and Lese began their relationship,  2 ½ years after

Lese finished her graduate degree, and over 11 months (approximately 300 days) after they ended their relationship.

301.     According to Lese's "Title IX Statement" (several aspects of which Plaintiff Reid disputes):

    **a.**  JMU hired Plaintiff Reid as the "speech team's assistant director of forensics" during Lese's junior year of undergraduate work (fall 2012).

    **b.**  Lese's undergraduate time with the team was a positive learning experience.

    **c.**  Lese took a graduate assistantship position with the team in 2014.

    **d.**  The relationship between Lese and Plaintiff Reid changed in the fall of 2015 (Lese's second year as a graduate student) when Lese "came out as bisexual to Alyssa and mentioned having feelings for her."  Plaintiff Reid stopped the conversation from going any further.

    **e.**  Lese claims that Plaintiff Reid later "decided to pursue me romantically until we had a sexual encounter at our national conference."

    **f.**  Lese was allegedly concerned about the relationship because Plaintiff Reid "was my supervisor…."  Plaintiff Reid allegedly assured Lese that if they "kept things quiet everything would be fine."

    **g.**  Lese and Plaintiff Reid dated for the rest of her time as a graduate assistant (from November 2015 to May 2016).

    **h.**  Lese and Plaintiff Reid continued their relationship until January 2018.

    **i.**  Lese claims that Plaintiff Reid told her not to tell anyone about their relationship "out of fear that it would have negative consequences professionally."  Even after Lese graduated in May 2016, Plaintiff Reid instructed her to keep their relationship

a secret.  This was "problematic" and "stemmed from the power dynamics of the student-to-faculty relationship."

     **j.**   Lese admitted in her "Title IX Statement" that her romantic relationship with Plaintiff Reid "did not end well," although she also asserted that such breakup was "due to entirely separate circumstances that are not relevant to the inappropriate nature of faculty to student relationships."

**302.**    Lese did not allege that Plaintiff Reid had violated a JMU policy.

**303.**    Lese did not allege that Plaintiff Reid had engaged in "sexual misconduct."

**304.**    Lese did not allege that Plaintiff Reid violated her rights under Title IX or that Plaintiff Reid otherwise violated Title IX.

**305.**    Lese did not allege that Plaintiff Reid sexually harassed her.

**306.**    Lese did not allege that Plaintiff Reid discriminated against her.

**307.**    Lese did not allege that Plaintiff Reid engaged in wrongful behavior.

**308.**    Lese did not allege that her relationship with Plaintiff Reid was anything other than consensual and mutual.

**309.**    Lese did not allege that her relationship with Plaintiff Reid was "nonconsensual."

**310.**    The focus of Lese's "Title IX Statement" was that period of time from November 2015 to May 2016 while she was a graduate assistant.

**311.**    Lese claimed in her "Title IX Statement" that the end of her relationship with Plaintiff Reid (around January 2018) was not relevant to her allegations.

**312.**    Because Lese's allegations against Plaintiff Reid were focused exclusively on that period of time from November 2015 to May 2016, any University action would have to be governed by the 2012 Policy #1324, which was the one in effect at that time.

B. **Title IX Office Notice to Plaintiff Reid**

313.     Defendant Sirocky-Meck appointed herself as the "Title IX Officer" for Lese's Complaint.  She thus played a dual role in this case, being JMU's Title IX Coordinator as well.

314.     On December 13, 2018, <u>nine days</u> after Lese filed her "Title IX Statement," Defendant Sirocky-Meck sent an email message to Plaintiff Reid informing her that she had been named as a "*Respondent in a Formal Complaint of Sexual Misconduct*" filed by Lese "on December 12, 2018 through Title IX." *See* Attachment 6.

315.     Defendant Sirocky-Meck misled Plaintiff Reid as to the "complaint commencement date," (e.g., the date on which Lese filed her allegations with the Title IX office).

316.     Defendant Sirocky-Meck also misled Plaintiff Reid regarding the nature of the document filed by Lese, referring to it as a "Formal Complaint."

317.     The document filed by Lese was not a "Formal Complaint."  Lese referred to it as a "Title IX Statement."

318.     Lese's "Title IX Statement" did not meet the University's requirements for being a "Formal Complaint."

319.     Defendant Sirocky-Meck informed Plaintiff Reid that, in response to Lese's submitting that document, "Title IX has opened the case to look into *the incident* that lead [sic] to the formal complaint."  (Emphasis added).

320.     Defendant Sirocky-Meck did not identify the alleged "incident" to which she was referring in her email message.

321.    Defendant Sirocky-Meck explained that "[t]he purpose" of "the [Title IX] case" was "to collect incident statements from the Reporter, Respondent and possible incident witnesses."

322.    Defendant Sirocky-Meck did not provide Plaintiff Reid with a copy of Lese's "Title IX Statement" at the time that she sent the December 13th email message.

323.    Defendant Sirocky-Meck did not provide Plaintiff Reid with a copy of Lese's "Title IX Statement" until approximately two months later in February 2019.

324.    Defendant Sirocky-Meck claimed in her December 13th email that "*[t]he specific incident of sexual misconduct named by the reporter* in the *Formal Complaint* is JMU Policy 1340.5.6 Non-Consensual Relationship, *specifically* that you and Lese were involved in a romantic and sexual relationship beginning Fall 2015 during the time when Lese was a graduate assistant with the Individual events team that you served as Assistant Director for."  (Emphasis added).

325.    Defendant Sirocky-Meck's December 13th email message falsely described the nature of the document filed by Lese, as well as the allegations that she made against Plaintiff Reid.

326.    Defendant Sirocky-Meck's description of Lese's "Title IX Statement" was inaccurate in at least the following respects:

    a.    Lese did not describe a "specific incident of sexual misconduct."

    b.    Lese did not file a "Formal Complaint."

    c.    Lese never referenced or described any violation of JMU Policy 1340.5.6.

    d.    Lese never claimed that Plaintiff Reid violated any University policy.

     **e.**   Lese never alleged that her relationship with Plaintiff Reid was "non-consensual."

     **f.**   Lese never identified "the incident" that led to the filing of a "Formal Complaint."

**327.**     The University Defendants failed to properly train and supervise Defendant Sirocky-Meck to ensure that she followed the JMU policies, including providing complete and accurate information to an employee accused of violating either 2012 Policy #1324 or the 2016/2018 Policy #1340.

**328.**     The University Defendants' failure to properly train and supervise Defendant Sirocky-Meck substantially impaired Plaintiff Reid's ability to defend herself, as she was not provided with adequate notice regarding the nature or basis for the charges or the allegations being made against her.

**329.**     Defendant Sirocky-Meck informed Plaintiff Reid in her December 13, 2018 email message that the Title IX office "does not adjudicate sexual misconduct cases for the university" but instead serves as a resource for the JMU employees involved in sexual misconduct complaints. According to Defendant Sirocky-Meck:

> Formal complaints of sexual misconduct against instructional Faculty with and without tenure and A&P faculty with tenure are heard through the Sexual Misconduct Accountability Process laid out in JMU Policy 1340.6.6.8 Sexual Misconduct Complaint process against faculty member.

**330.**     Defendant Sirocky-Meck's December 13, 2018 email message (which was sent at approximately 1:00 PM) was entitled "Notification of Title IX Formal complaint [sic]: Response needed by Friday Dec. 14 3:00 PM." Defendant Sirocky-Meck thus demanded that Plaintiff Reid provide an initial response to her email message within a little over twenty-four hours (despite having sat on Lese's statement for nine days).

**331.**     Defendant Sirocky-Meck instructed Plaintiff Reid that she was required to respond the very next day: "It is important that you respond via email by tomorrow, **Friday**

**December 14 at 3:00 PM** to inform Dr. Fife and me of when you are available during that time period for a meeting." (Bold in original).

332.     Defendant Sirocky-Meck also instructed Plaintiff Reid that they needed to schedule a meeting on the following Monday (three days later):  "Your direct supervisor, Dr Eric Fife and I are requesting that you meet with us on Monday, December 17, 2018 sometime between 10:30 AM and 1:00 PM that day."

333.     Defendant Sirocky-Meck's December 13th email message was sent at the beginning of the JMU Christmas break, and Plaintiff Reid had already left the school for the holiday.

334.     Defendant Sirocky-Meck's failure to immediately notify Plaintiff Reid of Lese's "Title IX Statement" (sitting on it for nine days) deprived her of the ability to respond as demanded by Defendant in her email message.

335.     Defendant Sirocky-Meck's failure to timely notify Plaintiff Reid of Lese's "Title IX Statement" prevented her from being able to respond prior to leaving campus.

336.     Defendant Sirocky-Meck threatened Plaintiff Reid that if she "fail[ed] to respond to the request in this notice or any of the terms of the notice, you may face additional action in accordance with university policy pertaining to employment."

337.     Defendant Sirocky-Meck attached to her December 13, 2018 email message a copy of the "Outline of the Sexual Misconduct Accountability Process for Complaints against Faculty Policy 1340-Sexual Misconduct," and a copy of the "Overview of the Procedures." She neither referenced nor provided Plaintiff Reid with a copy of the 2012 Policy #1324, which was the JMU policy that was in place and in effect for the relevant time period (November 2015 to May 2016).

338.     The University Defendants pursued an investigation related to Lese's "Title IX Statement" up through March, 2019.  That investigation included taking "witness statements" from a variety of individuals identified by both Lese and Plaintiff Reid.

339.     The University Defendants did not provide Plaintiff Reid's witnesses with a copy of Lese's "Title IX Statement."

340.     The University Defendants did not provide Plaintiff Reid with a copy of Lese's "Title IX Statement" until *after* Plaintiff Reid's supporting witnesses were interviewed. They were thus required to participate in the process without knowing the precise allegations made.

341.     Defendant Sirocky-Meck's decision to withhold Lese's actual "Title IX Statement" substantially hindered Plaintiff Reid and her witnesses from being able to address, respond to or refute the allegations that Lese had made.

342.     Upon information and belief Lese's witnesses were aware of the information that she had included in her "Title IX Statement."

343.     The University Defendants were biased in treating Plaintiff Reid differently than they treated Lese.

C.   **JMU Hearing and Appeal Related to Allegations Against Plaintiff Reid**

344.     On March 13, 2019, Defendant Sirocky-Meck sent Plaintiff Reid an email message providing information about the "Hearing Date, Time, and Location."  Such email message also contained substantive information about how the hearing would be conducted.

345.     Defendant Sirocky-Meck's March 13th email message informed Plaintiff Reid that the "Reporting and Responding Parties can choose if they would like to participate in the hearing or not."

346.    Defendant Sirocky-Meck's email later reiterated Defendants' policy that Lese was not required to attend and participate in the hearing:  "I want to reiterate that for the reporting … part[y], participating in the hearing itself is a choice that each individual must make for themselves."

347.    Defendant Sirocky-Meck's March 13th email message instructed Plaintiff Reid that either party could request a "temporary privacy screen be installed in the conference room to create a visual barrier between [the parties]" to "create a visual barrier during the hearing itself."

348.    Defendant Sirocky-Meck's March 13th email instructed Plaintiff Reid that, if Lese did appear in person, Plaintiff was prohibited from directly asking her any questions. Plaintiff Reid was instead required to direct her questions to the "hearing chair," who would vet each one and, if approved, repeat it to Lese.

349.    The University Defendants' hearing rules, as relayed by Defendant Sirocky-Meck, deprived Plaintiff Reid of the right to confront and cross-examine her accuser.

350.    Defendant Sirocky-Meck's March 13th email instructed Plaintiff Reid that she could have a "support person" in attendance, while limiting what that "support person" could do: "The Reporting Party and Responding Party are entitled to have an individual support person/advisor of their individual choice present with them at all proceedings and meetings. The Support Person/Advisor's role is to provide support to the party they are with.  Support Persons/Advisors do not have a speaking role in the case and do not speak for or represent the party they are supporting."

351.    Defendants prevented Plaintiff Reid from having any person other than her "support person/advisor" present during the hearing proceeding.

352.     Defendants prohibited Plaintiff Reid from seeking effective assistance of counsel.

353.     Defendant Sirocky-Meck's March 13th email message identified the University staff members who had been appointed to the hearing panel.

354.     Defendants prohibited Plaintiff Reid from peremptorily challenging any of the members of the hearing panel.  Plaintiff Reid could request removal of a member based on an undefined "good cause" standard.

355.     Defendant Sirocky-Meck informed Plaintiff Reid that the decision for removal of any hearing panel member rested solely with her as the Title IX Coordinator.

356.     Plaintiff Reid requested to have someone from the LGBTQ community appointed to the hearing panel.  The University Defendants refused such request.

357.     Lese's "Title IX Statement," the basis for the Title IX proceedings against Plaintiff Reid, was approximately two pages long and redacted.  It does not allege that Plaintiff Reid engaged in a "nonconsensual" relationship with Lese.

358.     The University Defendants did not provide Plaintiff Reid with an unredacted copy of Lese's allegations prior to the hearing.

359.     The University Defendants did not provide Plaintiff Reid with the factual or legal support for Defendant Sirocky-Meck's determination that Lese's allegations constituted a claim that Plaintiff Reid had engaged in a "non-consensual relationship."

360.     The University Defendants allowed Lese to pursue a Title IX claim against Plaintiff Reid despite the fact that there was no basis within the University's internal disciplinary procedures for doing so.

361.     Prior to the hearing date related to Lese's "Title IX Statement," and beginning on January 3, 2019, the University Defendants placed Plaintiff Reid on a leave of absence and

barred her from the campus, thereby preemptively punishing her prior to making any finding that she had violated University policy.

362.     Beginning on January 3, 2019 the University Defendants barred Plaintiff from taching any classes for that semester, or to otherwise participate in campus life and activities.

363.     Lese was not similarly placed on leave nor barred from the JMU campus.

364.     In February 2019, Plaintiff Reid applied for a promotion to be appointed as the "Director of Individual Events." On March 13, 2019, two weeks *before* the hearing date, the University notified Plaintiff Reid via email that she was no longer being considered as a candidate for that position. *See* Attachment 7.

365.     The University Defendants intervened in the hiring process related to the Director of Individual Events position before that position could be filled. Upon information and belief, such intervention occurred as a result of Lese merely filing her "Title IX Statement," and was intended to ensure that Plaintiff Reid was not hired for that position.

366.     The University Defendants thus punished Plaintiff Reid prior to the hearing on Lese's allegations and prior to any finding that she had violated University policy.

367.     The University Defendants' adverse actions against Plaintiff Reid violated University policy and violated her rights as a University faculty member.

368.     The University Defendants' adverse actions subjected Plaintiff Reid to embarrassment, humiliation, depression and diminished employment opportunities *before* the hearing took place.

369.     Such adverse action was improper because there was no conceivable harm to any member of the JMU community from Plaintiff Reid.

370.     Such adverse action was improper because it treated Plaintiff Reid as though she was guilty of the accusations, rather than treating her as innocent until *proven* guilty.

371.     Such adverse action was improper because it put Plaintiff Reid under extreme emotional distress, which hindered her ability to prepare for a fair hearing.

372.     The hearing related to Lese's "Title IX Statement" commenced on the evening of March 28, 2019.

373.     The University Defendants' framework for conducting such hearing were those rules, procedures, standards, and definitions laid out in JMUs 2018 Policy #1340.

374.     The University Defendants failed to follow the standards, procedures, and substance of the 2012 Policy #1324, despite the fact that it governed the relationship between Plaintiff Reid and Lese during the November, 2015 to May, 2016 interval.

375.     Plaintiff Reid attended the hearing in person with her mother as her "support person."

376.     Lese refused to attend the hearing, although she submitted a letter to be read to the hearing panel.

377.     The 2012 Policy #1324 required the University Defendants to provide Plaintiff Reid with Lese's letter.

378.     The 2018 Policy #1340 required the University Defendants to provide Lese's letter to Plaintiff Reid prior to the hearing to ensure that she had an equal opportunity to present appropriate information for the investigation and to defend herself.

379.     The University Defendants did not provide a copy of Lese's letter to Plaintiff Reid nor allow her to review it prior to the hearing.

380.     Plaintiff Reid requested a copy of Lese's letter both before and after the hearing. The University Defendants refused Plaintiff Reid's request.

381.     The University Defendants violated their own Policies (whether the 2012 Policy # 1324 or the 2018 Policy #1340) by refusing to provide Plaintiff Reid with a copy of Lese's written letter.

382.     Plaintiff Reid presented live testimony and documentary evidence during the Title IX hearing.

383.     Lese presented no live testimony or actual documentary evidence during the Title IX hearing.

384.     By allowing Lese to pursue her allegations against Plaintiff Reid, while also shielding her from attending the hearing, Defendants prevented Plaintiff Reid from being able to defend herself by cross-examining Lese or otherwise questioning her.

385.     Defendants' allowed Lese to pursue a Title IX claim against Plaintiff Reid without having to appear in person, thereby violating Plaintiff Reid's right to confront her accuser.

386.     The effect of allowing Lese to pursue a Title IX claim while shielding her from being questioned was to place the burden of proof on Plaintiff Reid.  While Defendants did not require Lese to present *any actual evidence* in support of her claims, Plaintiff Reid was required to refute them.

387.     The University Defendants had no ability to observe, assess, or determine Lese's credibility, as she never showed up for the hearing.

388.     The outcome of the hearing shows that the University Defendants and the hearing panel, unlawfully and in violation of Plaintiff Reid's rights, presumed that Lese's

allegations were true.   They presumed that her unsupported allegations represented "sufficient evidence" to show that Plaintiff Reid had violated Policy #1340.

389.     The University Defendants' decision to pursue a Title IX claim against Plaintiff Reid without the participation of the accuser ultimately made it impossible for her to defend herself or for these Defendants to make any findings of fact in a non-arbitrary manner.

390.     *If* Policy #1340 applied, it provided that Plaintiff Reid would be given an equal opportunity to present testimony, witnesses and evidence.   By allowing Lese to avoid appearing at the hearing Defendants failed to provide Plaintiff Reid with an equal opportunity to present testimony, witnesses and evidence.

391.     *If* Policy #1340 applied, by allowing Lese to avoid appearing at the hearing, Defendants deprived Plaintiff Reid of calling the most important witness that she needed to refute the claims made—Lese herself.

392.     Defendants denied Plaintiff Reid the right to question Lese about any of the following topics:

    **a.**   the nature of and basis for the allegations set forth in Lese's "Title IX Statement";

    **b.**   how their relationship started, who initiated it, how it was initiated, and Lese's insistence that they pursue a romantic relationship despite Plaintiff Reid's stated concerns;

    **c.**   how aggressive Lese was in pushing for a sexual relationship between them, with Lese engaging in such behavior both on and off campus, and during school-sponsored trips;

    **d.**   what demands Lese made during their relationship in terms of sexual activities;

    **e.** Lese's reaction to the Title IX complaint that was filed against Plaintiff Reid in approximately May 2016 related to their relationship; and

    **f.** how their relationship ended and its relevance to Lese's complaint and desire to punish Plaintiff Reid.

393.    Defendants prohibited Plaintiff Reid from cross-examining Lese related to the foregoing questions, as well as all other relevant areas of inquiry, with such prohibition being in clear violation of Plaintiff Reid's right to confront her accuser and due process.

394.    The foregoing questions were all relevant to Lese's allegations and Plaintiff Reid's defense.

395.    Obtaining answers to the foregoing questions would have shown that Lese's "Title IX Statement" was not a legitimate claim of sexual misconduct, but was instead designed to "get even" for a failed romantic relationship.

396.    Obtaining answers to the foregoing questions would have shown that Lese strategically and intentionally weaponized JMU's sexual misconduct policies and Title IX rules for revenge.

397.    Defendants, by allowing Lese to continue to pursue her complaint without having to answer these questions, not only aided and abetted her effort at revenge, but simultaneously violated Plaintiff Reid's constitutional right to due process and a fair hearing.

398.    Defendants' hearing rules shielded Lese from having to support her allegations, while simultaneously precluding Plaintiff Reid from defending herself.

399.    Lese submitted the unsworn and unsigned "witness incident statements" of four individuals.  Several of these "statements were heavily redacted.  Plaintiff Reid was not provided with unredacted copies prior to or during the hearing.

400.    None of Lese's witnesses supported the allegation that the relationship between Plaintiff Reid and Lese was nonconsensual.

401.    None of Lese's witnesses alleged that Plaintiff Reid had harassed Lese.

402.    None of Lese's witnesses alleged that Plaintiff Reid had discriminated against Lese.

403.    None of Lese's witnesses alleged that Plaintiff Reid had violated any University policy with regard to her relationship with Lese.

404.    All of Lese's witnesses stated that they knew Plaintiff Reid and Lese were in a romantic relationship, thereby contradicting Lese's allegation that Plaintiff Reid prohibited her from telling anyone about it.

405.    None of Lese's witnesses attended the hearing.

406.    Defendants allowed Lese to present witness statements to the hearing panel while also shielding such witnesses from being cross-examined.

407.    Defendants' decision to allow Lese to present written statements rather than requiring the live testimony of such witnesses violated Plaintiff Reid's right to cross-examine them.

408.    Lese presented no evidence that Plaintiff Reid had violated any University policy.

409.    Lese presented no evidence that Plaintiff Reid was a faculty member from whom she was taking a class during the November 2015 to May 2016 time period.

410.    Lese presented no evidence that her relationship with Plaintiff Reid was not freely and mutually entered into and continued.

411.     Lese presented no evidence that her relationship with Plaintiff Reid was coerced.

412.     Lese presented no evidence that her relationship was influenced by an unfair power differential.

413.     Lese presented no evidence that her relationship with Plaintiff Reid was the subject of inappropriate or undue pressure or force.

414.     Lese presented no evidence that Plaintiff Reid harassed her.

415.     Lese presented no evidence that Plaintiff Reid discriminated against her.

416.     Plaintiff Reid established that she had not violated any University policy.

417.     Defendant Pamela Sullivan, the Hearing Panel Chair, issued the written decision related to Lese's Title IX claim on April 1, 2019 finding that Plaintiff Reid was "responsible" for the charge of "non-consensual relationship." *See* Attachment 8.

418.     The hearing panel concluded that Plaintiff Reid had violated "Policy 1340 Sexual Misconduct 5.6 Non Consensual relationships."

419.     The hearing panel recommended that Plaintiff Reid be reprimanded by the University.

420.     The hearing panel's decision related to the relationship between Plaintiff Reid and Lese during the November 2015 to May 2016 time frame.

421.     Policy #1340 prohibiting "sexual misconduct," including "non-consensual relationships" did not exist during that period of time from November 2015 to May 2016.

422.     Plaintiff Reid could not have violated a policy in the November 2015 to May 2016 time-frame that did not exist until September 2016.

423.     The hearing panel reached no conclusion and made no finding as to what constituted the "non-consensual" aspect of the relationship between Plaintiff Reid and Lese.

424.     The hearing panel did not find that Plaintiff Reid violated University Policy #1324.

425.     The hearing panel did not find that Plaintiff Reid had discriminated against Lese under the 2012 Policy #1324.

426.     The hearing panel did not find that Plaintiff Reid harassed Lese under the 2012 Policy #1324.

427.     The hearing panel relied upon statements and documents that were not properly admitted and should not have been considered.

428.     The hearing panel's decision was not based upon actual admissible evidence, but upon hearsay and allegations that had never been subject to cross-examination.

429.     The hearing panel made credibility determinations without any ability to judge the credibility of the individuals who provided the information.

430.     Plaintiff Reid timely appealed the hearing panel's decision pursuant to the process provided for by University policy.

431.     Defendant Aguirre did not timely respond to Plaintiff Reid's appeal, instead taking an additional two weeks to issue his decision.

432.     Defendant Robert Aguirre, Dean of the College of Arts and Letters, also found that Plaintiff Reid was "responsible" for engaging in a "non-consensual relationship."

433.     Defendant Aguirre concluded that Plaintiff Reid's relationship was "inappropriate," without defining what that term meant.

434.     Defendant Aguirre concluded that Plaintiff Reid had violated JMU policy, but he did not identify which policy or during what time frame.

435.     Defendant Aguirre based his decision, at least in part, on Lese's written statement and the written statements that she submitted, none of which had been subjected to direct or cross-examination.

436.     Defendant Aguirre based his decision, at least in part, on Lese's allegations that she had been subjected to "verbal abuse and retaliation" by Plaintiff Reid after their relationship "went sour," at which time Lese had not been a student at JMU for approximately two years.

437.     There was no evidence in the record that Plaintiff Reid had verbally abused or retaliated against Lese at any time.

438.     Plaintiff Reid timely appealed Defendant Aguirre's decision to the Provost Heather Coltman

439.     Defendant Coltman issued her decision on June 19, 2019.  It likewise was based on Policy #1340.  *See* Attachment 9.

440.     Defendant Coltman claims to have done a "thorough review" of the "voluminous" materials related to Lese's claims against Plaintiff Reid.

441.     Defendant Coltman rejected Plaintiff Reid's claim that she was denied due process.

442.     Defendant Coltman wrongfully concluded that Plaintiff Reid had been informed of the charge of a "non-consensual relationship," ignoring the fact that no such policy existed during the November 2015 to May 2016 interval and, as a result, Plaintiff Reid could not be found to have violated the same.

443.     Defendant Coltman wrongfully concluded that Lese had made an accusation of "non-consensual relationship," when her "Title IX Statement" included no such allegation.

444.     Defendant Coltman disregarded the fact that it was Defendant Sirocky-Meck who had interpreted Lese's "Title IX Statement" as a claim of "non-consensual relationship," as Lese made no such allegation.

445.     Defendant Coltman disregarded the fact that there was no JMU policy defining a relationship as "non-consensual" during the November 2015 to May 2016 time period.

446.     Defendant Coltman disregarded the fact that Plaintiff Reid had not been provided with a copy of Lese's "Title IX Statement" at the time that she was required to identify witnesses, but was instead only informed of Defendant Sirocky-Meck's interpretation of Lese's allegations.

447.     Defendant Coltman disregarded the fact that Plaintiff Reid was not provided with a copy of Lese's letter prior to the Title IX hearing.  Plaintiff Reid instead heard Lese's letter for the first time during the course of the hearing.  Plaintiff Reid was never given adequate time to respond to or address Lese's letter.

448.     Defendant Coltman disregarded the fact that Plaintiff Reid was not allowed to question or cross-examine Lese or any of Lese's witnesses.

449.     Defendant Coltman disregarded the fact that the hearing panel did not have sufficient information to make any credibility determinations related to Lese or her witnesses, as they did not appear at the hearing.

450.     Defendant Coltman rejected Plaintiff Reid's claim regarding the University's refusal to allow her access to an attorney.

451.    Defendant Coltman rejected Plaintiff Reid's claim regarding the timeliness of the proceedings and appeal.

452.    Defendant Coltman affirmed the decision of Defendant Aguirre to dinfthat Plaintiff Reid was responsible for violating Policy #1340 and placed a letter of reprimand in her personnel file.

453.    At no time did Defendant Coltman acknowledge or address the fact that Policy #1340 did not exist during the relevant time period.

454.    All of the University Defendants disregarded the fact that they had previously investigated Plaintiff Reid's November 2015 to May 2016 relationship with Lese and concluded that it was neither prohibited nor otherwise considered inappropriate under JMU policy.  Having previously concluded that Reid had not violated JMU policy, the University Defendants had no basis for pursuing a Title IX action against her for the same actions, nor for punishing her in any way.

455.    Plaintiff Reid reasonably relied upon the University Defendants' previous conclusion that her relationship with Lese did not violate University policy.  By conducting a Title IX investigation under later-adopted policies, these Defendants violated Reid's due process rights.

456.    Defendants were complicit in allowing a faculty member (Lese) to weaponize Title IX to punish a former significant other.

457.    Defendants' actions against Plaintiff Reid were in violation of clear and unequivocal University and public policy as set forth in JMU's own rules and regulations, as well as the Virginia and United States Constitutions.

458.     Defendants' wrongful actions caused Plaintiff Reid embarrassment and humiliation and violated her personal right to privacy.

459.     Defendants' wrongful accusations against Plaintiff Reid that she engaged in sexual misconduct have exposed her to ridicule and invited harassment.

460.     Defendants' wrongful adjudication against Plaintiff Reid that she was responsible for sexual misconduct carried with it a powerful stigma and severe ramifications making it impossible for her to continue her employment with JMU.

461.     Defendants' actions were deliberate and created intolerable working conditions for Plaintiff Reid.

462.     No person should have to suffer the indignities visited upon Plaintiff Reid by the Defendants and their unlawful adjudication process.

463.     Plaintiff Reid has suffered the consequences of Defendants' lawlessness, and her rights and reputation must be restored.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF DUE PROCESS**
**42 U.S.C. § 1983, AND VA CONST. ART 1 §§ 11, 15**
**PLAINTIFF REID v. JAMES MADISON UNIVERSITY DEFENDANTS**
**REFUSAL TO ENFORCE THE CORRECT UNIVERSITY POLICY**

464.     Plaintiff Reid repeats and realleges each and every allegation set forth above as if fully set forth herein.

465.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

42 U.S.C. § 1983 provides a civil right of action for deprivations of constitutional protections taken under color of law.

466.    Article 1, Section 11 of the Constitution of the State of Virginia similarly provides that "no person shall be deprived of his life, liberty, or property without due process of law."

467.    Article 1, Section 15 of the Constitution of the State of Virginia further provides tht "no free government, nor the blessings of liberty, can be preserved to any people, but by a firm adherence to justice, moderation, temperance, frugality, and virtue; by frequent recurrence to fundamental principles; and by the recognition by all citizens that they have duties as well as rights, and that such rights cannot be enjoyed save in a society where law is respected and due process is observed."

468.    Due process is the foundation of our adjudicatory system.  Without it lawlessness prevails and constitutional rights are destroyed.

469.    When a right is protected by the Due Process Clauses of the United States Constitution or a State's Constitution, a State may not withdraw it on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct has occurred.

470.    Defendant JMU is a public university operating in the State of Virginia.

471.    A public university, when conducting a disciplinary proceeding and hearing, must provide the accused with prompt, meaningful and specific notice of the violation and charges against them, and the accused must have a meaningful opportunity to be heard.

472.    To satisfy the Due Process Clauses of the United States and/or Virginia Constitutions, a hearing must be a real one, not a sham or pretense.

473.    Plaintiff had a constitutionally protected property interest in being able to rely upon JMU's policies and procedures.

474.     Plaintiff has a constitutionally protected property interest in these Defendants'
adherence and compliance with JMU's policies and procedures.

475.     Plaintiff had a constitutionally protected property interest in not being subjected to
disciplinary measures, so long as she complied with the University's policies as they
existed during her employment.

476.     Plaintiff and JMU had a mutual understanding that she would be disciplined under
the University's policies only if it was proven that she had violated those policies.

477.     Elementary considerations of fairness dictate that individuals must have an
opportunity to know what the law and policies are in order to conform their conduct
accordingly; settled expectations cannot be disrupted.

478.     The principle that the legal effect of conduct should be assessed and judged
pursuant to the law and policies that existed when the conduct took place applies to the
University's policies and the proceedings instituted against Plaintiff Reid.

479.     The Due Process Clauses of both the United States and Virginia Consitutions
protect a person's interest in fair notice and repose.

480.     Fair notice is compromised by the retroactive application of legislation, regulations
or policies.

481.     Because Lese's claims against Plaintiff Reid pertained only to acts or actions that
took place during the November 2015 to May 2016 time period, the 2012 Policy #1324
governed the University Defendants' receipt of, response to, investigation of, hearing,
decisions and findings related to Lese's "Title IX Statement" and the claims made therein.

482.     Plaintiff Reid's actions and her relationship with Lese during the November 2015
to May 2016 time period must be assessed pursuant to JMU's 2012 Policy #1324.

483.     Plaintiff Reid's actions and her relationship with Lese during the November 2015 to May 2016 interval, having already been adjudges as non-violative of the 2012 Policy #1324, should not have been re-investigated.

484.     JMU's 2012 Policy #1324 described and defined the circumstances under which a faculty member was subject to a complaint, a disciplinary proceeding, and sanctions for actions that took place while that policy was in effect, including during the November 2015 to May 2016 time period.

485.     Once adopted and while in effect, JMU's 2012 Policy #1324 provided Plaintiff Reid with notice as to what would be considered discrimination and harassment and, hence, what actions or conduct would be potentially sanctionable.

486.     The University Defendants were required to enforce, comply with and adhere to the 2012 Policy #1324 in addressing Lese's "Title IX Statement."

487.     Defendant Sirocky-Meck knew or should have known that Lese's "Title IX Statement" did not meet the requirements of and could not be considered a "Formal Complaint" under the 2012 Policy #1324.

488.     Defendant Sirocky-Meck knew or should have known that Lese's "Title IX Statement" was inadequate on its face pursuant to the requirements of the 2012 Policy #1324.

489.     Defendant Sirocky-Meck knew or should have known that Lese's "Title IX Statement" failed as a "Formal Complaint," as it was not signed as required by Section 6.2.1 and other provisions of the 2012 Policy #1324.

490.     Defendant Sirocky-Meck knew or should have known that Lese's "Title IX Statement" failed as a "Formal Complaint" because it did not "detail[] the allegations" and

did not provide any "detail" about the charges, let alone provide "as much detail as possible." as required by Section 6.2.1. of JMU's 2012 Policy #1324.

491.    Defendant Sirocky-Meck, as the Title IX Coordinator/Title IX Officer, improperly treated Lese's "Title IX Statement" as a "Formal Complaint" in violation of JMU policy and Plaintiff Reid's rights.

492.    Defendant Sirocky-Meck failed to inform Plaintiff Reid that she had decided to ignore the deficiencies in Lese's "Title IX Statement," so that she could treat it as a "Formal Complaint" for the purpose of opening and pursuing a Title IX investigation against her.

493.    According to Section 6.2.2. of the 2012 Policy #1324, Defendant Sirocky-Meck was required, "upon receipt of the complaint" to "determine whether the policy applies … and [to] dismiss the complaint if the policy does not apply… ."

494.    Defendant Sirocky-Meck violated Section 6.2.2. of the 2012 Policy #1324 by failing and refusing to carry out her responsibilities as required, thereby violating her obligations as the Title IX Coordinator and Title IX Officer.

495.    Section 6.2.2.(1) of the Policy #1324 imposed an affirmative obligation on Defendant Sirocky-Meck to test Lese's allegations against the Policy:  "the Title IX Officer may find that this policy does not apply upon determining … [t]hat even if the complainant's allegations are true, the respondent's conduct would not constitute harassment or discrimination *as defined in this policy*."  (Emphasis added).

496.    Sections 6.2.4. and 6.2.7. of the 2012 Policy #1324 imposed additional obligations on Defendant Sirocky-Meck related to investigating Lese's allegations and, upon finding them deficient (as they clearly were), dismissing her "Title IX Statement."

497.     Defendant Sirocky-Meck knew or should have known that, even taking Lese's allegations in her "Title IX Statement" as true, Plaintiff Reid's conduct did not constitute harassment or discrimination as defined in the 2012 Policy #1324.

498.     Defendant Sirocky-Meck knew or should have known that Lese's "Title IX Statement" did not claim that Plaintiff Reid discriminated against her or harassed her.

499.     Defendant Sirocky-Meck knew or should have known that Lese's "Title IX Statement" did not claim that Plaintiff Reid had deprived her of a privilege or right or that she had been otherwise adversely affected.

500.     Defendant Sirocky-Meck knew or should have known that Lese's "Title IX Statement" did not claim that Plaintiff Reid had engaged in unwelcome or offensive physical, verbal or written conduct that showed an aversion or hostility towards her based on her sex or sexual orientation.

501.     Defendant Sirocky-Meck knew or should have known that Lese's "Title IX Statement" did not allege that Plaintiff Reid had any negative impact on her as a graduate student at JMU.

502.     Section 6.2.1. of Policy #1324 imposed a 180-day deadline for filing a complaint: "The formal complaint *must be filed* by the complainant not later than 180 days after the last date of discriminatory or harassing *behavior* by providing the Title IX Office with a signed written document detailing the allegations… ."   (Emphasis added),

503.     The "behavior" complained of by Lese in her "Title IX Statement" was the alleged "student-to-faculty relationship" that she had with Plaintiff Reid during the November 2015 to May 2016 time period while she was a graduate assistant.

504.     Section 6.2.2.(4) of the Policy #1324 imposed an affirmative obligation on
Defendant Sirocky-Meck to determine whether Lese's "Title IX Statement" was "timely
filed."

505.     Defendant Sirocky-Meck knew or should have known that Lese's "Title IX
Statement" was filed well after the 180-day deadline provided for in the Policy.

506.     Defendant Sirocky-Meck knew or should have known that Lese's "Title IX
Statement" was filed more than two (2) years after that deadline had passed.

507.     According to Section 6.2.2. of the 2012 Policy #1324, the Title IX Officer's
decision that the policy did not apply would have been final and not subject to appeal.

508.     Had Defendant Sirocky-Meck complied with the requirements of Section 6.2.2.,
she would have concluded that Lese's "Title IX Statement" did not meet the requirements
of the 2012 Policy #1324 and would have dismissed it.

509.     Had Defendant Sirocky-Meck complied with the requirements of Sections 6.6.1.
and 6.2.2., she would have concluded that Lese's "Title IX Statement" was untimely and
would have dismissed it.

510.     The 2012 Policy #1324 required Defendant Sirocky-Meck to dismiss Lese's "Title
IX Statement."

511.     By refusing to comply with the requirements of Section 6.2.2., Defendant Sirocky-
Meck violated those rights, entitlements, and protections afforded to Plaintiff Reid pursuant
to the Fourteenth Amendment to the United States Constitution and the 2012 Policy #1324.

512.     Defendant Sirocky-Meck's decision to withhold Lese's "Title IX Statement" from
Plaintiff Reid for approximately two months violated Section 6.2.1. of the 2012 Policy
#1324, which provision required her to "notify the respondent and the [Director of Equal

Opportunity], *supplying both with a copy of the [formal] complaint*" (emphasis added) as one of the very first steps in the "Complaint Process" set forth in Section 6.2.1.

513.     By withholding Lese's "Title IX Statement" from Plaintiff Reid for approximately two months, Defendant Sirocky-Meck denied Plaintiff fair notice of the actual claims against her, thereby depriving her of the ability to fully prepare for and participate in the Title IX proceedings and defend herself.

514.     By withholding Lese's "Title IX Statement" from Plaintiff Reid for approximately two months, Defendant Sirocky-Meck was able to conceal the fact that she had failed to comply with JMU's policies and procedures for intake and investigation.

515.     By withholding Lese's "Title IX Statement" from Plaintiff Reid for approximately two months, Defendant Sirocky-Meck was able to conceal the fact that such "Statement" was insufficient under JMU's policies for opening and pursuing a Title IX investigation of Plaintiff Reid.

516.     By withholding Lese's "Title IX Statement" from Plaintiff Reid for approximately two months, Defendant Sirocky-Meck prevented her from challenging its sufficiency and seeking dismissal of the Title IX proceeding.

517.     By withholding Lese's "Title IX Statement" from Plaintiff Reid for approximately two months, Defendant Sirocky-Meck was able to avoid dismissing Lese's allegations as required by JMU's policies.

518.     By withholding Lese's "Title IX Statement" from Plaintiff Reid for approximately two months, Defendant Sirocky-Meck created a situation whereby Plaintiff and her witnesses were left guessing as to the nature of Lese's claims.

519.     Defendant Sirocky-Meck's misrepresentations regarding the nature of Lese's "Title IX Statement" violated JMU's own policies and procedures, including but not limited to those set forth in 2012 Policy #1324.

520.     Defendant Sirocky-Meck never informed Plaintiff Reid that she had misrepresented the nature and substance of Lese's allegations.

521.     Defendant Sirocky-Meck's misrepresentations substantially impaired Plaintiff Reid's ability to defend herself, as she was not provided with fair and adequate notice regarding the nature or basis for the charges and allegations against her.

522.     By designating Lese's "Title IX Statement" as a "Formal Complaint," Defendant Sirocky-Meck became an advocate on behalf of Lese and falsified the allegations made, commenced a Title IX investigation in violation of JMU policies, and set a process in motion that by definition violated Plaintiff Reid's rights.

523.     Defendant Sirocky-Meck's advocacy on behalf of Lese violated Plaintiff Reid's rights, entitlements and protections, as provided for in the JMU policies and procedures.

524.     Defendant Sirocky-Meck failed to carry out her responsibilities and violated her obligations under JMU's 2012 Policy #1324.

525.     The University Defendants violated their obligations and the procedures set forth in JMU's 2012 Policy #1324.

526.     The University Defendants failed to meet the deadlines set forth in JMU's 2012 Policy #1324 and deprived Plaintiff Reid of her right to a fair and timely investigation, hearing, appeal and resolution.

527.     The University Defendants failed to meet the deadlines set forth in JMU's 2012
Policy #1324 and deprived Plaintiff Reid of her right to dismissal of Lese's allegations and
claims as set forth in her "Title IX Statement."

528.     The University Defendants' violation of their responsibilities and obligations under
JMU's 2012 Policy #1324 deprived Plaintiff Reid of rights, entitlements and protections,
as set forth in University policy and violated her constitutional right to due process.

529.     The University Defendants failed to discipline Defendant Sirocky-Meck for
violating the 2012 Policy #1324 in terms of her handling of Lese's "Title IX Statement."

530.     The 2012 Policy #1324 provided for sanctions "commensurate with the severity
and/or frequency of the offense… ."

531.     Any sanctions imposed pursuant to the 2012 Policy #1324 would have to be
imposed only *after* the process had played out, including the proper investigation, hearing
and appeal.

532.     The University Defendants imposed sanctions against Plaintiff Reid *prior to*
making any finding that she had violated University policy, *prior to* conducting the
required investigation, and *prior to* completing the hearing and appeal process.

533.     The University Defendants barred Plaintiff Reid from the JMU campus during the
course of the investigation and disallowed her from teaching courses or working with her
team.

534.     The University Defendants barred Plaintiff Reid from applying to be the Director
of the Individual Events Team as a result of Lese filing her "Title IX Statement."  They
imposed such bar prior to the hearing and prior to any determination as to whether Plaintiff
Reid had violated University policy.

535.     Plaintiff Reid has a cognizable liberty interest in not being falsely branded as having improperly engaged in a nonconsensual relationship with Lese.

536.     The University Defendants' finding that Plaintiff Reid had engaged in a non-consensual relationship was false.

537.     The University Defendants' finding that Plaintiff Reid had engaged in a non-consensual relationship with Lese from November 2015 to May 2016 was injurious to Plaintiff Reid's reputation.

538.     The University Defendants' finding that Plaintiff Reid had engaged in an inappropriate relationship while also serving as a supervisor was injurious to Plaintiff Reid's reputation.

539.     Had The University Defendants employed an appropriate investigation and conducted a fair hearing in this matter, they would have rightly determined that Lese's allegations did not state a claim of misconduct under 2012 Policy #1324, that such allegations were false, and that Plaintiff Reid did not engage in a non-consensual relationship with Lese.

540.     The University Defendants' actions have called into question Plaintiff's good name, reputation, honor and integrity in such a manner as to have made it impossible for her to continue her employment with JMU and have made it virtually impossible for her to find new employment in her chosen field.

541.     The Due Process Clauses of the United States and Virginia Constitutions protect personal decisions relating to personal relationships, and matters involving the most intimate choices central to personal dignity and autonomy are central to the liberty protected by the Fourteenth Amendment.

542.    The University Defendants have deprived Plaintiff of her constitutionally cognizable property and liberty interests.

543.    The University Defendants have invaded Plaintiff Reid's right to privacy and subjected her to embarrassment, humiliation and ridicule.

544.    Plaintiff Reid has suffered a tangible and material injury as a result of The University Defendants' actions, investigation, decisions and findings, because those findings have been communicated to other parties, including to prospective employers.

545.    Because The University Defendants' false findings have been communicated to prospective employers, Plaintiff Reid has been unable to find suitable academic employment despite being fully qualified.

546.    The University Defendants, acting under color of law, deprived Plaintiff Reid of her constitutionally protected reputational interests by opening an investigation that was time-barred, and then employing a flawed investigation, hearing and appeal process that failed to comport with the basics of due process.

547.    As a direct and proximate result of the above conduct, Plaintiff Reid sustained damages, including, without limitation, for constructive discharge, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future economic losses.

548.    As a result of the foregoing, Plaintiff Reid is entitled to a judgment against The University Defendants and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT II
## VIOLATION OF DUE PROCESS
## 42 U.S.C. § 1983, AND VA CONST. ART 1 §§ 11, 15
## PLAINTIFF REID v. JAMES MADISON UNIVERSITY DEFENDANTS
## REFUSAL TO ALLOW CONFRONTATION AND CROSS-EXAMINATION

549.     Plaintiff Reid repeats and realleges each and every allegation set forth above as if fully set forth herein.

550.     In any proceeding in which the credibility of the accuser or the witnesses is at issue, the The Due Process Clauses of the United States and Virginia Constitutions mandate that the accused be provided with a fair and impartial hearing before a neutral fact-finder with the opportunity to conduct cross-examination.

551.     If a public university has to choose between competing narratives to resolve a disciplinary matter, the university must give the accused or her agent an opportunity to cross-examine the accuser and any adverse witnesses in the presence of a neutral fact-finder.

552.     It is not possible for a neutral fact-finder to make credibility determinations in a "she said/she said situation" when the accuser refuses to appear at the hearing.

553.     It is a violation of the Due Process Clauses of the United States and Virginia Constitutions, and the rights of the accused, for a university hearing panel to determine the credibility of an accuser who refuses to attend and testify at an impartial hearing.

554.     It is a violation of the Due Process Clauses of the United States and Virginia Constitutions for a university hearing panel to make a determination of guilt based upon accusations made, rather than on evidence presented during the course of an impartial hearing.

555.     With regard to Lese's "Title IX Statement," the University Defendants were required to provide Plaintiff Reid with a prompt, meaningful and specific notice of the violation and the charges against her, and an opportunity to be heard; to provide a fair and impartial hearing before a neutral fact-finder; to provide an opportunity to confront and cross-examine Lese and her witnesses; to properly place the burden of proof on the accuser and/or the school; and to ensure that any determination of guilt was based upon actual evidence presented at the hearing rather than on the accusations made.

556.     The University Defendants failed to meet each of the foregoing requirements and, as a result, deprived Plaintiff Reid of her due process rights.

557.     The University Defendants refused to provide Plaintiff Reid with a prompt, meaningful and specific notice of the violation and the charges against her, and an opportunity to be heard.

558.     The University Defendants refused to provide a fair and impartial hearing before a neutral fact-finder.

559.     The University Defendants refused to provide Plaintiff Reid with an opportunity to confront and cross-examine Lese and her witnesses.

560.     The University Defendants placed the burden of proof on Plaintiff Reid rather than on Lese where it should have been.

561.     The University Defendants did not ensure that their determination of Plaintiff Reid's guilt was based upon actual evidence presented at the hearing rather than on the accusations made.

562.    The University Defendants also violated the Due Process Clauses of the United States and Virginia Constitutions by twice investigating Plaintiff Reid's relationship with Lese, thereby putting her in "double jeopardy" on a claim found groundless the first time.

563.    The University Defendants acted in their official and individual capacities in depriving Plaintiff Reid of her constitutional rights.

564.    The University Defendants were acting under color of law during their investigation, hearing process, appellate process, and discipline of Plaintiff Reid.

565.    As a direct and proximate result of the above conduct, Plaintiff Reid sustained damages, including, without limitation, for constructive discharge, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future economic losses.

566.    As a result of the foregoing, Plaintiff Reid is entitled to a judgment against the University Defendants and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

<u>COUNT III</u>
<u>VIOLATION OF DUE PROCESS</u>
<u>42 U.S.C. § 1983 AND VA CONST. ART 1 §§ 11, 15</u>
<u>PLAINTIFF REID v. JAMES MADISON UNIVERSITY DEFENDANTS</u>
<u>RETROACTIVE APPLICATION OF UNIVERSITY POLICY</u>

567.    Plaintiff Reid repeats and realleges each and every allegation set forth above as if fully set forth herein.

**568.**    The University first adopted Policy #1340 in September 2016 and revised it in 2018.

**569.**    The University first adopted Policy #1340 roughly four months after Lese completed her graduate program with JMU.

82

570.     The University first adopted Policy #1340 roughly four months after Lese was no longer a student at JMU.

571.     The University first adopted Policy #1340 roughly four months after there was no longer even arguably a "student to faculty" relationship or "imbalance of power" between Plaintiff Reid and Lese.

572.     The terms, conditions, prohibitions, and requirements of Policy #1340 could not be applied retroactively to conduct and actions that took place prior to the existence of the policy.

573.     There is nothing in Policy #1340 indicating that it could be the basis for a proceeding taking place in 2019 related to the first six months of a relationship that took place during the November 2015 to May 2016 time period.

574.     JMU's Policy #1340 did not exist at the time that Plaintiff Reid and Lese began their relationship or at any time while Lese was a student or a graduate assistant.

575.     JMU's Policy #1340 could not have governed the relationship between Plaintiff Reid and Lese during the period of time from November 2015 to May 2016 because it did not yet exist.

576.     JMU's Policy #1340 could not have governed Plaintiff Reid's conduct during the period of time from November 2015 to May 2016 because it did not yet exist.

577.     JMU's 2012 Policy #1324, the policy in existence when Plaintiff Reid and Lese began their relationship, did not define "consensual" or "nonconsensual" relationships.

578.     The University Defendants never placed Plaintiff Reid on notice that the conduct she engaged in from November 2015 to May 2016 could be judged based on a policy that

did not exist, nor that her relationship could later be defined under a concept that had not yet been established.

579.     The University Defendants never informed Plaintiff Reid at any time during the underlying proceedings  that JMU's Policy #1340 did not exist at the time that Plaintiff Reid and Lese began their relationship nor at any time while Lese was a student or a graduate assistant.

580.     The University Defendants' decision to retroactively apply Policy #1340 to Plaintiff Reid's relationship with Lese deprived her of fair notice and due process by making it impossible for her to conform her conduct in the November 2015 to May 2016 time period to a standard that did not exist and a policy that had not yet been written or adopted.

581.     The University Defendants' decision to retroactively apply Policy #1340 to the relationship between Plaintiff Reid and Lese prevented Plaintiff Reid from being able to fairly defend herself during the Title IX proceedings.

582.     By defining Lese's "Title IX Statement" as a "Formal Complaint" under Policy #1340, the University Defendants set in motion a series of events that were designed to and did deprive Plaintiff Reid of an impartial and fair proceeding, thereby preventing her from being able to fully defend herself.

583.     By defining Lese's "Title IX Statement" as a "Formal Complaint" under Policy #1340, the University Defendants imposed a burden of proof on Plaintiff Reid that she could not meet, requiring her to prove that in 2015-2016 she did not violate a policy that did not exist, based on a definition that had not yet been created, and that had nothing to do with the actual allegations that Lese made in her "Title IX Statement."

584.    Defendant Sirocky-Meck had an affirmative obligation to determine which JMU policy applied to Lese's "Title IX Statement."

585.    Defendant Sirocky-Meck had an affirmative obligation to inform Lese that Policy #1340 did not apply to her "Title IX Statement" and to dismiss her allegations.

586.    Defendant Sirocky-Meck violated University policy by failing to inform Lese that Policy #1340 did not apply to her "Title IX Statement."

587.    *Even if* Policy #1340 applied, Lese did not claim in her "Title IX Statement" that her relationship with Plaintiff Reid during November 2015 to May 2016 was "non-consensual"; the University Defendants instead unilaterally made that determination, and in doing so invaded Plaintiff Reid's privacy and her bedroom.

588.    *Even if* Policy #1340 applied, Lese's "Title IX Statement" did not comply with or conform to its requirements, as it was not signed and it did not detail the allegations being made against Plaintiff Reid.

589.    *Even if* Policy #1340 applied, the untimeliness of Lese's "Title IX Statement" and lack of detail made it impossible for the University to impartially and fairly investigate her allegations against Plaintiff Reid.

590.    *Even if* Policy #1340 applied, Defendant Sirocky-Meck knew or should have known that Lese's "Title IX Statement" did not comply with University policy as it was both untimely and lacked sufficient detail for investigation and hearing.

591.    *Even if* Policy #1340 applied, The University Defendants were required to dismiss Lese's "Title IX Statement" for failing to conform to the requirements of University policy.

592.     *Even if* Policy #1340 applied, Lese's "Title IX Statement" did not allege that Plaintiff Reid's actions during the November 2015 to May 2016 time period constituted "harassment."

593.     *Even if* Policy #1340 applied, Lese's "Title IX Statement" did not allege that Plaintiff Reid engaged in "sexual misconduct" during November 2015 to May 2016.

594.     *Even if* Policy #1340 applied, Lese's "Title IX Statement" did not allege that Plaintiff Reid's conduct during November 2015 to May 2016 constituted sexual assault, sexual violence, sexual harassment, dating violence, domestic violence, relational violence, sexual exploitation, or stalking.

595.     *Even if* Policy #1340 applied, Lese's "Title IX Statement" did not allege that Plaintiff Reid discriminated against her or harassed her on the basis of or because of her sex, sexual orientation, gender or gender identity.

596.     *Even if* Policy #1340 applied, Defendant Sirocky-Meck was required to prepare a written document representing the results of her investigation into Lese's allegations. Defendant Sirocky-Meck failed and refused to do so.

597.     *Even if* Policy #1340 applied, Defendant Sirocky-Meck, as the Title IX Officer, was required to determine whether the "Title IX Statement" provided sufficient information to conduct an investigation and/or gather statements.  She failed and refused to do so.

598.     *Even if* Policy #1340 applied, Defendant Sirocky-Meck, as the Title IX Officer, was required to be an impartial investigator and treat both Lese and Plaintiff Reid fairly.  She failed and refused to do so.

**599.**     JMU's Policy #1340 did not require the person lodging the complaint to attend the hearing in person, while still allowing the hearing to go forward.

**600.**     JMU's Policy #1340 provided that equal opportunity "shall" be given to both the person lodging the complaint and the respondent to present testimony, witnesses and evidence.

**601.**     JMU's Policy #1340 provided that both the complainant and the respondent would have "timely access to documents and information considered by the hearing panel."

**602.**     Lese refused to attend the hearing related to her "Title IX Statement."

**603.**     All of the individuals who ostensibly supported Lese's allegations against Plaintiff Reid refused to attend the hearing related to her "Title IX Statement."

**604.**     *Even if* Policy #1340 applied, by allowing Lese and her witnesses to refuse to attend the hearing in person, while still allowing the matter to proceed, The University Defendants violated Plaintiff Reid's right to present testimony, witnesses and evidence.

**605.**     *Even if* Policy #1340 applied, by allowing Lese and her witnesses to refuse to attend the hearing in person, The University Defendants violated Plaintiff Reid's right to confront and cross-examine her accuser.

**606.**     *Even if* Policy #1340 applied, The University Defendants failed and refuse to provide Plaintiff Reid with the process that she was due.

**607.**     *Even if* Policy #1340 applied, The University Defendants' procedures and hearing process were fundamentally unfair and lacked basic elements of due process by, among other things, denying Plaintiff Reid with fair notice and the right to cross-examine her accuser.

608.     *Even if* Policy #1340 applied, and had The University Defendants employed an appropriate investigation, hearing and appeal in this matter, they would have determined that Lese's allegations were false and that Plaintiff Reid did not engage in a non-consensual relationship with her.

609.     *Even if* Policy #1340 applied, and had The University Defendants employed an appropriate investigation,  hearing and appeal in this matter, they would have determined that Lese's allegations were false and that Plaintiff Reid did not violate University policy with regard to her relationship with Lese.

**610.**     *Even if* Policy #1340 applied, The University Defendants failed to meet their own deadlines and deprived Plaintiff Reid of her right to fair and timely investigation, hearing, appeal and resolution.

611.     Plaintiff had a constitutionally protected property interest in not being subjected to disciplinary measures, so long as she complied with the University's policies as they existed during her employment.

612.     Plaintiff and JMU had a mutual understanding that she would be disciplined under the University's policies only if it was established that she had violated those policies.

613.     The University Defendants' actions have called into question Plaintiff's good name, reputation, honor and integrity in such a manner as to have made it impossible for her to continue her employment with JMU and to have made it virtually impossible for her to find new employment in her chosen field.

614.     The University Defendants have deprived Plaintiff of her constitutionally cognizable property and liberty interests.

615.     The University Defendants have invaded Plaintiff Reid's right to privacy and subjected her to embarrassment, humiliation and ridicule.

616.     Plaintiff Reid has suffered a tangible and material injury as a result of the University Defendants' investigation, hearing process, appeal process, decisions and findings, because those decisions and findings have been communicated to other parties.

617.     Plaintiff Reid has also suffered tangible and material injury, because the decisions and findings have been communicated to prospective employers.

618.     Because The University Defendants' false and unlawful findings have been communicated to prospective employers, Plaintiff Reid has been unable to find suitable academic employment despite being fully qualified.

619.     The University Defendants deprived Plaintiff Reid of her reputational interests by employing a flawed investigation, hearing and appeal process that failed to comport with the basics of due process.

620.     The University Defendants, acting under color of law, deprived Plaintiff Reid of her constitutionally protected reputational interests.

621.     As a direct and proximate result of the above conduct, Plaintiff Reid sustained damages, including, without limitation, damages for constructive discharge, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future economic losses.

622.     As a result of the foregoing, Plaintiff Reid is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
## VIOLATION OF TITLE IX
## PLAINTIFF REID v. JAMES MADISON UNIVERSITY DEFENDANTS

623.     Plaintiff Reid repeats and realleges each and every allegation set forth above as if fully set forth herein.

624.     Title IX provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."   20 U.S.C. § 1681.

625.     Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant JMU.

626.     Title IX prohibits any covered entity from discriminating "in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time" "on the basis of sex." 34 C.F.R. § 106.51(a)(1).

627.     Title IX requires a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. §106.8(b).

628.     Defendant JMU's grievance procedures related to Lese's allegations against Plaintiff were neither prompt nor equitable.

629.     Defendant JMU discriminated against Plaintiff Reid because of her sex by applying an unfair, unreliable, and inapplicable process in resolving Lese's complaints against her. The outcome in this case was erroneous because Plaintiff Reid was innocent and did not violate Defendant JMU's policies.

630.     The outcome of this case was erroneous because Plaintiff Reid did not violate the then-current University policy when she entered into a relationship with Lese.

631.     Plaintiff Reid was not accused of and did not violate the 2012 Policy #1324.

632.     Plaintiff Reid could not have violated the Policy #1340 during the November 2015 to May 2016 time frame as such policy did not yet exist.

633.     ED informed the University Defendants in 2017 that adherence to the 2011 DCL and 2014 Q & A risked depriving the accused in Title IX proceedings of their constitutional rights and due process protections.

634.     ED placed the University Defendants on notice that there were certain steps that they were required to take in a Title IX investigation and proceeding to ensure protection of constitutional rights.

635.     The University Defendants rejected ED's instructions and refused to amend Policy #1340 or otherwise act to ensure protection of Plaintiff Reid's constitutional rights and her rights as protected by Title IX.

636.     The University Defendants failed and refused to provide written notice to Plaintiff Reid as the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview.

637.     The University Defendants failed and refused to provide Plaintiff Reid with sufficient details that included the identities of the parties involved, the specific section of the code of conduct she violated, the precise conduct constituting the potential violation, and the date and location of the alleged incident.

638.     The University Defendants failed and refused to provide Plaintiff Reid with written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation.

639.     The University Defendants failed and refused to conclude their investigation with a written report summarizing the relevant exculpatory and inculpatory evidence.

640.     The University Defendants failed and refused to provide Plaintiff Reid with timely and equal access to any information that will be used during the formal disciplinary meetings and hearings.

641.     Gender and LGBTQ bias was a motivating factor in the University Defendants' findings against Plaintiff Reid.

642.     The University Defendants failed to conduct an impartial, fair, and reliable investigation, hearing and appeal.

643.     The University Defendants' discriminatory process deprived Plaintiff Reid, a female member of the LGBTQ community, of employment opportunities and imposed discipline on her on the basis of her sex and sexual orientation.

644.     The University Defendants' policies, actions, and procedures violated Plaintiff Reid's rights and entitlements under Title IX.

645.     The University Defendants applied JMU's policies and procedures in a gender-biased manner and discriminated against Plaintiff Reid on the basis of her sex, which led to an erroneous and adverse employment outcome.

646.    The University Defendants' investigation and procedures were fundamentally flawed, and deprived Plaintiff Reid of the protections she was entitled to under the United States and Virginia Constitutions and University policy.

647.    The circumstances showing that the outcome of the JMU proceedings was erroneous, include, without limitation:

a.  The University Defendants applied the wrong process and procedure to Lese's "Title IX Statement," with the 2012 Policy #1324 (not Policy #1340) being in place and applicable during the relevant time period.

b.  The University Defendants retroactively applied a policy first adopted in September 2016 and later amended in 2018 (after the subject relationship had ended) to categorize, designate and define as sanctionable a relationship that took place prior to either the existence or the effective date of that policy.

c.  The University Defendants applied the wrong policy to Lese's "Title IX Statement" and, in doing so, redefined her allegations against Plaintiff Reid as engaging in a "non-consensual relationship."

d.  The University Defendants evaluated Lese's claims based upon the theory that she was claiming that her relationship with Plaintiff Reid was "non-consensual" during that period of time (prior to September 2016) when no such concept existed.  Their action deprived Plaintiff Reid of her right to fair notice as to what type of conduct would be considered a violation of University policy and subject to University punishment.

e.  By applying the wrong policy to Lese's "Title IX Statement," the University Defendants avoided scrutinizing it pursuant to the substantive and procedural

requirements of the 2012 Policy #1324.  Had they applied the correct policy (#1324), Lese's "Title IX Statement" would have been dismissed, and Plaintiff Reid would not have been subjected to the hearing or punishment at issue here.

f.  Lese did not claim in her "Title IX Statement" that her relationship with Plaintiff Reid from November 2015 to May 2016 was "non-consensual"; Defendant Sirocky-Meck created that claim.

g.  Defendant Sirocky-Meck's decision to treat Lese's "Title IX Statement" as a claim of a "non-consensual relationship" infected the entire process from that point forward, with the investigation, hearing, and appeal and all related decisions being contaminated thereby.

h.  The University Defendants either ignored or outright violated their own policies in terms of conducting an impartial and fair investigation, hearing and appeal related to Lese's "Title IX Statement" pursuant to the standards, procedures, and rules that they had adopted.

i.  The 2012 Policy #1324 included a limitations period of 180 days "after the last date of discriminatory or harassing behavior."  Lese was thus required to file her "Formal Complaint" with the Title IX Office no later than December 2016.  She did not file her "Title IX Statement" until December 2018, two full years *after* the limitations period had lapsed.  The University Defendants thus had no jurisdiction to pursue Lese's claims against Plaintiff Reid, but they did so anyway.

j.  The University Defendants violated their own policies by failing to dismiss Lese's "Title IX Statement" as being untimely.

k.  The University Defendants violated their own policies by failing to determine as an initial matter whether Lese's "Title IX Statement" was sufficient in terms of the nature of the allegations made and specificity to institute a Title IX proceeding against Plaintiff Reid.

l.  The University Defendants violated their own policies by failing to dismiss Lese's "Title IX Statement" as being insufficient in detail and specificity.

m.  The University Defendants violated their own policies by failing to dismiss Lese's "Title IX Statement" as lacking any allegation that Plaintiff Reid discriminated against her, harassed her, or otherwise violated University policy by engaging in a relationship with her.

n.  The University Defendants violated their own policies by failing to dismiss Lese's "Title IX Statement" for being entirely inadequate in identifying the manner in which Plaintiff Reid had discriminated against her, had harassed her, or had otherwise violated University policy in effect during the time period at issue (November 2015 to May 2016).

o.  The University Defendants allowed Lese to pursue a Title IX complaint against Plaintiff Reid while also shielding her from having to appear at the hearing and be subject to cross-examination.

p.  The University Defendants blocked Plaintiff Reid from cross-examining Lese or her witnesses.

q.  The University Defendants made credibility determinations about Lese and her witnesses.  The University Defendants had no ability to make such determinations, however, as all of the accuser's witnesses refused to appear at the hearing.

r.  The University Defendants allowed Lese to pursue her claims against Plaintiff Reid despite the fact that all of the information that she presented (in her "Title IX Statement," her letter, and her witness statements) were hearsay.

s.  The University Defendants presumed that Lese's accusations were true, while also shielding Lese and her witnesses from cross-examination by Plaintiff Reid or questioning from the hearing panel.

t.  The University Defendants violated their own policies in terms of burden of proof, forcing Plaintiff Reid to respond to Lese's accusations without first requiring Lese to present sufficient evidence to prove that Plaintiff Reid had discriminated against her, harassed her, or violated University policy,

u.  The University Defendants violated their own policies in terms of burden of proof, forcing Plaintiff Reid to prove that she had not engaged in a non-consensual relationship with Lese, without first requiring Lese to present sufficient evidence to prove that she had.

v.  The hearing panel's decision is riddled with errors and misstates the testimony of the witnesses.

w.  The failure, without explanation, to include a member of the LGBTQ community on the panel contributed to the bias of the panel.

648.  The University Defendants' investigation and hearing procedures were inadequate to ensure the protection of Plaintiff Reid's constitutional and employment rights.  Such inadequacies include but are not limited to the following:

a.  They failed to accurately inform Plaintiff Reid of the nature and substance of Lese's allegations against her.

b.   They failed to guarantee that Plaintiff Reid would be provided an advisor.

c.   They did not allow active participation by Plaintiff Reid's advisor in the investigation or hearing.

d.   They prohibited Plaintiff Reid from cross-examining Lese and her witnesses.

e.   They prohibited Plaintiff Reid from confronting her accuser.

f.   They did not require the recordation of witness interviews.

g.   They did not require that witnesses provide sworn testimony.

h.   They did not require investigators to disclose exculpatory or other favorable evidence to Plaintiff Reid.

i.   They placed the burden of proof on Plaintiff Reid, not on her accuser.

j.   They provided for a finding of responsibility against Plaintiff Reid on a mere preponderance of the evidence.

649.   The University Defendants' decisions finding Plaintiff Reid to be responsible for having engaged in a "non-consensual relationship" were biased and not based on the actual evidence that was presented at the hearing.

650.   Based on the foregoing, Plaintiff Reid was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

651.   As a direct and proximate result of the above conduct, Plaintiff Reid sustained damages, including, without limitation, damages for constructive discharge, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future economic losses.

652.     As a result of the foregoing, Plaintiff Reid is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT V**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,**
**5 U.S.C. § 706(2)(D)**
**PLAINTIFF REID v. DEFENDANTS SECRETARY CARDONA AND**
**DEPARTMENT OF EDUCATION**
**CHALLENGE TO 2011 DCL**

653.     Plaintiff Reid repeats and realleges each and every allegation set forth above as if fully set forth herein.  Defendant ED's promulgation of the 2011 DCL constituted "rule making" within the meaning of the APA, 5 U.S.C. § 551(5), and was subject to the notice and comment requirements of 5 U.S.C. § 553.

654.     The 2011 DCL imposed substantive requirements upon regulated entities above and beyond those required by federal statute or the ED before then.

655.     Under the 2011 DCL, schools receiving federal financial assistance were required, among other things, to use a preponderance of the evidence standard in sexual misconduct disciplinary proceedings.

656.     Promulgation of the 2011 DCL without notice and without providing an opportunity for comment ignored procedures required by law.

657.     Defendant ED has treated the 2011 DCL as imposing binding legal obligations on regulated parties.

658.     Defendant ED commenced enforcement actions against covered entities for not adhering to the requirements set out in the 2011 DCL.

659.     The purpose of the 2011 DCL was to limit, restrict, and/or nullify the constitutional rights, entitlements and protections of anyone accused of sexual harassment or sexual misconduct in relation to the education setting.

660.     Defendant JMU substantially altered its investigatory processes and Title IX compliance procedures in response and as a result of the 2011 DCL and Defendant ED's related enforcement activity.

661.     The University Defendants applied the 2011 DCL requirements in their Title IX disciplinary proceedings against Plaintiff Reid, and she is therefore within the zone of interests protected by Title IX.

662.     Defendants ED and Cardona have publicly stated an intent to return to requiring schools to follow the procedures, mandates and requirements set forth in the 2011 DCL related to Title IX complaints.

663.     The 2011 DCL was unlawful when issued and implemented and must be set aside under 5 U.S.C. § 706(2)(D).

664.     Implementation of the 2011 DCL, or any similar guidance document, violates the Due Process Clause of the United States Constitution and must be set aside.

**COUNT VI**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,**
**5 U.S.C. § 706(2)(D)**
**PLAINTIFF REID v. DEFENDANTS SECRETARY CARDONA AND**
**DEPARTMENT OF EDUCATION**
**CHALLENGE TO 2014 Q & A**

665.     Plaintiff Reid repeats and realleges each and every allegation set forth above as if fully set forth herein.  Defendant ED's promulgation of the 2014 Q & A constituted "rule making" within the meaning of the APA, 5 U.S.C. § 551(5), and was subject to the notice and comment requirements of 5 U.S.C. § 553.

666.     The 2014 Q & A imposed substantive requirements upon regulated entities above and beyond those required by the ED before then.

667.     Under the 2014 Q & A, schools receiving federal financial assistance were required, among other things, to apply a strong presumption that an otherwise consensual sexual relationship between an adult faculty member and an adult student is not consensual and therefore constitutes discrimination based on sex.

668.     Under the 2014 Q & A, schools receiving federal financial assistance are also required to adhere to the 2011 DCL's requirements, even when adjudicating complaints against faculty.

669.     Promulgation of the 2014 Q & A, without notice and without providing an opportunity for comment, ignored procedures required by law.

670.     Defendant ED has treated the 2014 Q & A as imposing binding legal obligations on regulated parties.

671.     The purpose of the 2014 Q & A was to limit, restrict, and/or nullify the constitutional rights, entitlements, and protections of anyone accused of sexual harassment or sexual misconduct in the education setting.

672.     Defendant JMU substantially altered its investigatory processes and Title IX compliance procedures in response and as a result of the 2014 Q & A and Defendant ED's related enforcement activity.

673.     The University Defendants applied the 2014 Q & A in disciplinary proceedings against Plaintiff Reid, and she is therefore within the zone of interests protected by Title IX.

674.     Defendants ED and Cardona have publicly stated an intent to return to requiring

schools to follow the procedures, mandates and requirements set forth in the 2014 Q & A

related to Title IX complaints.

675.     The 2014 Q & A was unlawful when implemented and must be set aside under 5

U.S.C. § 706(2)(D).

Implementation of the 2014 Q & A, or any similar guidance document, violates the Due

Process Clause of the United States Constitution and must be set aside.

**COUNT VII**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,**
**5 U.S.C. § 706(2)(C)**
**PLAINTIFF REID v. DEFENDANTS SECRETARY CARDONA AND**
**DEPARTMENT OF EDUCATION**

676.      Plaintiff Reid repeats and realleges each and every allegation set forth above as if

fully set forth herein.  Title IX provides that no person, "on the basis of sex," shall be

subjected to any discrimination under any federally funded educational program or activity.

677.     Title IX does not require that covered institutions employ any particular procedural

mechanism for disciplining students or faculty.

678.     Title IX does not prohibit any covered institution from taking adequate measures

to ensure that disciplinary proceedings are fair and impartial.

679.     Procedural protections applicable to all accused persons and enshrined in the Bill

of Rights do not constitute improper discrimination based on sex.

680.     The 2011 DCL forbids covered institutions from applying certain procedural

protections to the accused.

681.     Defendant ED has  treated the 2011 DCL as imposing binding legal obligations on

regulated parties.

682.     Defendant ED has commenced enforcement actions against covered entities for not

adhering to the requirements set out in the 2011 DCL.

683.     The University Defendants substantially altered their investigatory processes in

response to the 2011 DCL and Defendant ED's enforcement activities.

684.     The University Defendants applied the 2011 DCL requirements in their Title IX

disciplinary proceedings against Plaintiff Reid, and she is therefore within the zone of

interests protected by Title IX.

685.     Forbidding covered institutions from providing procedural protections to accused

persons exceeds Defendants Secretary Cardona and ED's authority under Title IX.

686.     Therefore, the 2011 DCL should be set aside under 5 U.S.C. § 706(2)(C), and

Secretary Cardona and ED must be forbidden from prohibiting covered institutions from

providing procedural protections to accused persons.

687.     Implementation of the 2011 DCL, or any similar guidance document, in such a way

as to prohibit covered institutions from providing procedural protections ot accused persons

violates the Due Process Clause of the United States Constitution and must be prohibited.

### COUNT VIII
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
### 5 U.S.C. § 706(2)(C)
### PLAINTIFF REID v. DEFENDANTS SECRETARY CARDONA
### AND DEPARTMENT OF EDUCATION

688.      Plaintiff Reid repeats and realleges each and every allegation set forth above as if

fully set forth herein.  Title IX provides that no person, "on the basis of sex," shall be

subjected to any discrimination under any federally funded educational program or activity.

689.     Title IX does not require that covered institutions employ any particular procedural

mechanism for disciplining students or faculty.

690.     Title IX does not prohibit any covered institution from taking adequate measures to ensure that disciplinary proceedings are fair and impartial.

691.     Procedural protections applicable to all accused persons and enshrined in the Bill of Rights do not constitute improper discrimination based on sex.

692.     Title IX does not prohibit consenting adults from entering into romantic or sexual relationships.

693.     Under the 2014 Q & A, schools receiving federal financial assistance are required, among other things, to apply a strong presumption that an otherwise consensual sexual relationship between an adult faculty member and an adult student is not consensual and therefore constitutes discrimination based on sex.

694.     Under the 2014 Q & A, schools receiving federal financial assistance are also required to adhere to the 2011 DCL's requirements, even when adjudicating complaints against faculty.

695.     Defendant ED has treated the 2014 Q & A as imposing binding legal obligations on regulated parties.

696.     The University Defendants applied the 2014 Q & A in their Title IX disciplinary proceedings against Plaintiff Reid and she is therefore within the zone of interests protected by Title IX.

697.     Forbidding covered institutions from providing procedural protections to accused persons exceeds Defendants Secretary Cardona and ED's authority under Title IX.

698.     Therefore, the 2014 Q & A should be set aside under 5 U.S.C. § 706(2)(C), and Secretary Cardona and ED must be forbidden from prohibiting covered institutions from providing procedural protections to accused persons

699.     Implementation of the 2014 Q & A, or any similar guidance document, in such a way as to prohibit covered institutions from providing procedural protections to accused persons violates the Due Process Clause of the United States Constitution and must be prohibited.

## COUNT IX
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,
## 5 U.S.C. § 706(2)(A)
## PLAINTIFF REID v. DEFENDANTS SECRETARY CARDONA AND
## DEPARTMENT OF EDUCATION

700.     Plaintiff Reid repeats and realleges each and every allegation set forth above as if fully set forth herein.  Title IX provides that no person, "on the basis of sex," shall be subjected to any discrimination under any federally funded educational program or activity.

701.     Title IX does not require that covered institutions employ any particular procedural mechanism for disciplining students or faculty.

702.     Title IX does not prohibit any covered institution from taking adequate measures to ensure that disciplinary proceedings are fair and impartial.

703.     Procedural protections applicable to all accused persons and enshrined in the Bill of Rights do not constitute improper discrimination based on sex.

704.     The 2011 DCL forbids covered institutions from affording certain required procedural protections to the accused because to do so supposedly would not ensure prompt and equitable resolution of complaints.

705.     The 2011 DCL does not adequately explain why procedural protections prevent an equitable result.

706.     Providing procedural protections to the accused ensures an equitable outcome; it does not prevent one.

707.    Defendant ED has treated the 2011 DCL as imposing binding legal obligations on regulated parties.

708.    The University Defendants applied the 2011 DCL requirements in their Title IX disciplinary proceedings against Plaintiff Reid, and she is therefore within the zone of interests protected by Title IX.

709.    Forbidding covered institutions from affording procedural protections to the accused is arbitrary and capricious and exceeds Defendants Secretary Cardona and ED's authority under Title IX.

710.    Therefore, the 2011 DCL should be set aside under 5 U.S.C. § 706(2)(A), and Secretary Cardona and ED must be forbidden from prohibiting covered institutions from providing procedural protections to accused persons.

711.    Implementation of the 2011 DCL, or any similar guidance document, in such a way as to prohibit covered institutions from providing procedural protections to accused persons violates the Due Process Clause of the United States Constitution and must be prohibited.

**COUNT X**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,**
**5 U.S.C. § 706(2)(A)**
**PLAINTIFF REID v. DEFENDANTS SECRETARY CARDONA AND**
**DEPARTMENT OF EDUCATION**

712.    Plaintiff Reid repeats and realleges each and every allegation set forth above as if fully set forth herein.  Title IX provides that no person, "on the basis of sex," shall be subjected to any discrimination under any federally funded educational program or activity.

713.    Title IX does not require that covered institutions employ any particular procedural mechanism for disciplining students or faculty.

714.     Title IX does not prohibit any covered institution from taking adequate measures to ensure that disciplinary proceedings are fair and impartial.

715.     Procedural protections applicable to all accused persons and enshrined in the Bill of Rights do not constitute improper discrimination based on sex.

716.     Title IX does not prohibit consenting adults from entering into romantic or sexual relationships.

717.     The 2014 Q & A required covered institutions to apply a strong presumption that an otherwise consensual sexual relationship between an adult faculty member and an adult student is not consensual and therefore constitutes discrimination based on sex.

718.     The 2014 Q & A supports this conclusion by reference to criminal conduct by adult educators committed against children who cannot legally consent.

719.     The 2014 Q & A does not justify why this presumption would apply to consenting adults in a post-secondary education environment.

720.     The 2014 Q & A also forbids covered institutions from affording procedural protections to the accused because to do so supposedly would not ensure prompt and equitable resolution of complaints.

721.     The 2014 Q & A does not adequately explain why procedural protections prevent an equitable result.

722.     Providing procedural protections to the accused ensures an equitable outcome; it does not prevent one.

723.     Defendant ED has treated the 2014 Q & A as imposing binding legal obligations on regulated parties.

724.     The University Defendants applied the 2014 Q & A requirements in their Title IX disciplinary proceedings against Plaintiff Reid, and she is therefore within the zone of interests protected by Title IX.

725.     The 2014 Q & A document is arbitrary and capricious and exceeds Defendants Secretary Cardona and ED's authority under Title IX.

726.     Therefore, the 2014 Q & A should be set aside under 5 U.S.C. § 706(2)(A), and Seretary Cardona and ED must be forbidden from prohibiting covered institutions from providing procedural protections to accused persons.

727.     Implementation of the 2014 Q & A, or any similar guidance document, in such a way as to prohibit covered institutions from providing procedural protections to accused persons violates the Due Process Clause of the United States Constitution and must be prohibited.

**COUNT XI**
**VIOLATION OF THE SPENDING CLAUSE**
**PLAINTIFF REID v. DEFENDANTS SECRETARY CARDONA AND**
**DEPARTMENT OF EDUCATION**

728.     Plaintiff Reid repeates and realleges each and every allegation set forth above as if fully set forth herein.  The Spending Clause grants Congress the power "to pay the Debts and provide for the ... general Welfare of the United States." U.S. Const., Art. I, § 8, cl. 1.

729.     Title IX was enacted pursuant to the Spending Clause. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998).

730.     The Spending Clause limits Congress' authority to condition payment of federal funds on state and local actors' engaging or refusing to engage in certain behavior.

731.    Congress, and by extension an administrative surrogate, must speak "unambiguously" if it "intends to impose a condition on the grant of federal moneys." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

732.    Congress, and its administrative surrogates, may not condition the grant of federal funds on a state or local actor's, including a university's, engaging in otherwise unconstitutional behavior. *South Dakota v. Dole*, 483 U.S. 203, 208 (1987).

733.    Congress is forbidden from coercing states or local actors, including universities, to adopt certain policies and practices on threat of having federal funds revoked. *Dole*, 483 U.S. at 211.

734.    Defendant JMU receives a significant amount of federal funding each year, which is necessary for the University's continued operation.

735.    Defendant JMU's receipt of federal funding is conditioned on the university's continued compliance with Title IX.

736.    Defendants Secretary Cardona and ED have altered and intend to continue to alter the express terms of Title IX by imposing the requirements set out in the 2011 DCL and the 2014 Q & A or similar guidance documents.

737.    Defendants Secretary Cardona and ED also altered the express terms of Title IX through threatened and actual enforcement actions aimed at forcing covered institutions to alter disciplinary procedures.

738.    Defendants Secretary Cardona and ED continue to alter the terms of Title IX by enforcing existing consent agreements and insisting that covered institutions not revert to fair procedures that were used before the 2011 DCL and the 2014 Q & A.

739.	Defendants Secretary Cardona and ED improperly coerced colleges and universities to adopt fundamentally unfair campus disciplinary proceedings through the 2011 DCL and the 2014 Q & A.

740.	Defendants Secretary Cardona and ED improperly coerced colleges and universities to adopt fundamentally unfair campus disciplinary proceedings through threatened and actual enforcement actions aimed at forcing covered institutions to adopt disciplinary procedures that violated constitutionally guaranteed due process rights.

741.	Defendants Secretary Cardona and ED coerced the University Defendants to amend JMU's  policies on threat of enforcement action.

742.	Defendants Secretary Cardona and ED continue to coerce colleges and universities by enforcing existing consent agreements and insisting that covered institutions not revert to fair procedures that were used before the 2011 DCL and the 2014 Q & A.

743.	Defendants Secretary Cardona and ED have altered the requirements set out in Title IX, and  improperly coerced covered institutions, including JMU, to apply policies that violate the Virginia and United States Constitutions for fear of losing federal funding.  It was this coercion that caused Plaintiff Reid's injury.

744.	Despite the rescission of the 2011 DCL and the 2014 Q & A, the University Defendants continue to employ a fundamentally unfair campus disciplinary system for fear that Defendants Secretary Cardona and ED will rescind federal funding.

745.	The University Defendants applied unfair and unconstitutional disciplinary proceedings against Plaintiff Reid because of Defendants Secretary Cardona and ED's conduct, and she is therefore within the zone of interests of Title IX.

746.     Defendants Secretary Cardona and ED therefore violated the Spending Clause by issuing the 2011 DCL and the 2014 Q & A, and by engaging in enforcement actions related to covered institutions' campus disciplinary procedures.

747.     Therefore, the 2011 DCL and the 2014 Q & A must be set aside.

## COUNT XII
## BREACH OF CONTRACT

748.     Plaintiff Reid repeats and realleges each and every allegation set forth above as if fully set forth herein.

749.     A contract existed between JMU and Plaintiff Reid.

750.     A term of that contract was that Plaintiff Reid would not be disciplined absent proven violations of stated policies of JMU.

751.     Another term of that contract was that Plaintiff Reid would not be disparaged and her future employment opportunities in her field be eliminated based on false pretenses or unfair procedures.

752.     JMU breached that contract by disregarding its own stated policies, the law, and the agreement between it and Plaintiff Reid to label her relationship "non-consenual."

753.     Plaintiff Reid suffered and continues to suffer foreseeable damages from this breach.

754.     As a direct and proximate result of JMU's breach, Plaintiff Reid sustained damages, including, without limitation, for constructive discharge, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future economic losses.

As a result of the foregoing, Plaintiff Reid is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff Alyssa Reid demands judgment in her favor and against Defendants as follows:

(i)     On COUNT I, COUNT II, and COUNT III for violation of Plaintiff's rights and entitlements under the Fourteenth Amendment to the United States Constitution and the Virginia Constitution, a judgment against the University Defendants awarding Plaintiff Reid damages in an amount to be determined at trial, including, without limitation, damages for constructive discharge, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future economic losses, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    On COUNT IV  for violation of Title IX of the Education Amendments of 1972, a judgment against the University Defendants awarding Plaintiff Reid damages in an amount to be determined at trial, including, without limitation, damages for constructive discharge, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future economic losses, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)   A declaratory judgment against Defendant JMU and the University Defendants sued in their official capacities, pursuant to 28 U.S.C. § 2201, declaring that: (i) the

outcome and findings made by Defendant JMU should be reversed; (ii) Plaintiff Reid's reputation should be restored; (iii) Plaintiff Reid's disciplinary record be expunged; (iv) the record of Plaintiff Reid's reprimand and discipline be removed from her employment file; and (v) any record of the "Title IX Statement" or complaint against Plaintiff Reid be permanently destroyed;

(iv)   An injunction against Defendant JMU and the University Defendants sued in their official capacities directing them to: (i) reverse the outcome and findings regarding Lese's "Title IX Statement" and allegations;   (ii) expunge Plaintiff Reid's disciplinary record; (iii) remove any record of Plaintiff Reid's reprimand and discipline from her employment file; and (iv) permanently destroy any record of Lese's "Title IX Statement," complaint or other allegations;

(v)   On COUNT V and COUNT VI, enter a declaratory judgment that Defendants Department of Education and Secretary Cardona have violated the APA (5 U.S.C. § 706(2)(D)) by failing to notify the public and afford the public an opportunity to comment on the changes imposed upon colleges and universities receiving federal funding by the 2011 Dear Colleague Letter and the 2014 Q & A, plus attorneys' fees, expenses, costs and disbursements;

(vi)   On COUNT VII and COUNT VIII, a declaratory judgment that Defendants Department of Education and Secretary Cardona have violated the APA (5 U.S.C. § 706(2)(C)) because the changes imposed upon colleges and universities receiving federal funding by the 2011 Dear Colleague Letter and the 2014 Q & A exceeded the Department of Education's statutory authority, and were therefore unlawfully issued, a declaratory judgment forbidding Defendants Department of Education and

Secretary Cardona from issuing substantially similar guidance or rules, plus attorneys' fees, expenses, costs and disbursements;

(vii)  On COUNT IX and COUNT X, a declaratory judgment that Defendants Department of Education and Secretary Cardona have violated the APA (5 U.S.C. § 706(2)(A)) because the changes imposed upon colleges and universities receiving federal funding by the 2011 Dear Colleague Letter and the 2014 Q & A exceeded the Department of Education's statutory authority, and were therefore unlawfully issued, a declaratory judgment forbidding Defendants Department of Education and Secretary Cardona from issuing substantially similar guidance or rules, plus attorneys' fees, expenses, costs and disbursements;

(viii)  On COUNT XI, a declaratory judgment that Defendants Department of Education and Secretary Cardona violated the Spending Clause by improperly coercing colleges and universities receiving federal funding to alter their campus disciplinary proceedings, a declaratory judgment that Defendants Department of Education and Secretary Cardona acted unlawfully in promulgating the 2011 DCL, and the 2014 Q & A, and a declaratory judgment forbidding Defendants Department of Education and Secretary Cardona from issuing substantially similar guidance or rules, plus attorneys' fees, expenses, costs and disbursements; and

(ix)  On COUNT XII, for breach of contract, a judgment awarding Plaintiff Reid damages in an amount to be determined at trial, including, without limitation, damages for constructive discharge, for loss of career opportunities and prospects, for reputational damages, for emotional distress, and damages for past and future

economic losses, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(x)     Awarding Plaintiff Alyssa Reid her attorneys fees and costs pursuant to 42 U.S.C § 1988.

(xi)    Awarding Plaintiff Alyssa Reid such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

May 3, 2021

                         Respectfully,

                         */s/ John J. Vecchione*
                         John J. Vecchione (VSB No. 73828)
                         Attorney for Plaintiff
                         Senior Litigation Counsel
                         New Civil Liberties Alliance
                         1225 19th St. N.W., Suite 450
                         Washington, D.C. 20036
                         Telephone:     (202) 869-5210
                         Facsimile:      (202) 869-5238
                         John.Vecchione@ncla.legal