IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| ALYSSA REID, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:21-cv-00032 |
| | ) | |
| JAMES MADISON UNIVERSITY, et al., | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Alyssa Reid, formerly a faculty member at James Madison University (JMU), brings this action against the University Defendants (collectively JMU and various university officials[1]) and the United States Department of Education, and Miguel Cardona, Secretary of the Department of Education (collectively ED) alleging various claims arising from a Title IX investigation, hearing, and reprimand sanction involving Reid and Kathryn Lese, who was a graduate student and then a faculty member at JMU.  After receiving the reprimand, Reid later resigned.  Against the University Defendants, Reid alleges due process claims pursuant to 42 U.S.C § 1983 and in violation of the Virginia Constitution for refusing to enforce the correct JMU policy (Count I),[2] failing to allow confrontation and cross-examination of Lese and her witnesses (Count II), and retroactive application of a JMU policy at the hearing (Count III).  She further alleges a Title IX violation (Count IV), and she has withdrawn her breach of contract claim (Count XII).  Against

---

[1] The individual University Defendants are Jonathan Alger, President of JMU; Heather Coltman, Provost and Senior Vice President for Academic Affairs; Robert Aguirre, Dean of the College of Arts and Letters; and Amy M. Sirocky-Meck, Title IX Coordinator.

[2] Federal and Virginia due process protections are "coterminous."  *Mandel v. Allen*, 81 F.3d 478, 479 (4th Cir. 1996).

ED, Reid alleges violations of the Administrative Procedure Act (APA) by failing to notify the public and provide an opportunity for comment regarding the 2011 "Dear Colleague Letter" (2011 DCL) (Count V) and regarding the 2014 Questions and Answers on Title IX (2014 Q&A) (Count VI). She further asserts claims under the APA for the ED's lack of statutory authority to issue the 2011 DCL and the 2014 Q&A (Counts IX and X) and a claim for violation of the Spending Clause regarding the same (Count XI).

Defendants moved to dismiss Reid's complaint for lack of subject matter jurisdiction and failure to state a claim. (Dkt. Nos. 9, 15.) Because the claims against the University Defendants are barred by the statute of limitations and Reid lacks standing to sue the ED, both motions will be granted.

## I.  BACKGROUND[3]

### A.  Plaintiff Reid's History with JMU, Relationship with Lese, and 2016 Investigation

Reid was employed by JMU in the summer of 2012 as Assistant Director of Individual Events in the School of Communication Studies. Her responsibilities involved assisting with coaching, tournament travel and logistics, community outreach, administering finances, mentoring, working with students on their performance skills, and lecturing. (Compl. ¶¶ 240–246.)

Reid met Lese in 2012 when Lese was an undergraduate. Lese graduated from JMU in the spring of 2014 and took a graduate teaching position with the James Madison Forensics Team. By this time, Reid and Lese were "best friends," spending time together both personally and professionally, but they had not yet begun a romantic relationship. (Compl. ¶¶ 249–251.)

---

[3] As is required for these motions, the court accepts plaintiff's factual allegations as true.

In the fall of 2014, Lese was assigned as a graduate student to the "Individual Events Team." Neither Reid nor Lee Mayfield (Director of the Individual Events Team) had any supervisory responsibilities or authority over Lese while she was a graduate student, as those duties fell under the purview of the Director of the Graduate Program for Communication Studies. Reid and Lese, in their respective roles with the "Individual Events Team," were colleagues and co-coaches with largely similar responsibilities. Reid was not a member of the Graduate Department and had no supervisory responsibilities or authority over Lese in her graduate program. Reid was not on any thesis committee, nor did she teach any graduate courses while Lese was in the graduate program. Reid had no decision-making authority over graduate-student travel (including Lese's), over graduate-student compensation (including what Lese was paid), whether Lese did or did not receive any scholarships, or which graduate assistants would be assigned to the Communication department. Reid had no faculty involvement with the graduate program and had no influence over academic matters. (Compl. ¶¶ 252–263.)

In October 2015, Lese first expressed a romantic interest in Reid, but Reid had concerns. (Compl. ¶¶ 264–270.) Nonetheless, Reid and Lese began an intimate relationship in November 2015, with Lese later bragging to Reid and others about the fact that she was the one who had "made the first move." They agreed to keep their relationship private to avoid impacting the team or sparking interdepartmental gossip. (Compl. ¶¶ 271–275.) Lese obtained her graduate degree in May 2016, and JMU hired her as a full-time employee beginning June 2016. Reid and Lese moved in together in the summer of 2017, and Reid and Lese continued their relationship for over twenty-seven (27) months, through January 2018. (Compl. ¶¶ 276–279, 285.)

In May 2016, someone lodged an anonymous Title IX allegation against Reid regarding the relationship. No one from JMU, including the Title IX Department, notified Reid of such

allegation at that time.  Reid's Department Chair later informed her that the Title IX office had

investigated the allegation and concluded that the environment on the team was not problematic.

He also informed her that there were no problems associated with her personal relationship with

Lese because she was not Lese's direct supervisor.  Lese was upset that someone had challenged

the propriety of their relationship, stating that it was none of the University's business.  (Compl.

¶¶ 280-284.)

However, when Reid and Lese ended their relationship in February 2018, Lese did not

take the break-up well and began stalking Reid, sending her abusive and threatening text

messages, policing Reid's social media, and harassing her.  Reid reported Lese's behavior to the

University Defendants during the Title IX investigation and proceeding that is the subject of this

lawsuit.  (Compl. ¶¶ 286-291.)

**B. 2011 "Dear Colleague Letter" (2011 DCL) and 2014 "Questions and Answers on Title IX" (2014 Q&A)**

On April 4, 2011, the Department of Education's Office of Civil Rights (OCR) published

the 2011 DCL.  The document is styled as a "significant guidance document" and states that it

"does not add requirements to applicable law."  The Department did not subject the 2011 DCL to

the APA notice-and-comment process before its promulgation.  (Compl. ¶¶ 37–39.)

The 2011 DCL directed schools to "take immediate action to eliminate harassment,

prevent its recurrence, and address its effects."  As part of the mandated efforts to publish and

implement procedures for the "prompt and equitable resolution" of sexual misconduct claims,

the 2011 DCL expressly required that schools adopt a preponderance of evidence standard of

proof in their investigations of allegations of sexual misconduct, making it clear that the higher

clear and convincing evidence standard that some schools used is not equitable under Title IX.

2011 DCL at 11.  The 2011 DCL also strongly discouraged schools "from allowing the parties personally to question or cross-examine each other during the hearing."  The 2011 DCL further warned of the possibility of the initiating "proceedings to withdraw Federal funding" for failure to comply.  (Compl. ¶¶ 48–50.)

The 2014 Q&A, like the 2011 DCL, styled itself as a "significant guidance document." Also, like the 2011 DCL, the 2014 Q&A was not subjected to the APA notice-and-comment process before promulgation.  The 2014 Q&A confirmed that OCR considered a school's use of a preponderance of the evidence standard to be mandatory.  "The school must use a preponderance-of-the-evidence (i.e., more likely than not) standard in any Title IX proceedings, including any factfinding and hearings."  2014 Q&A.  The 2014 Q&A applied these same standards to "employee-on-student sexual violence" and "sexual harassment."

The 2014 Q&A also addressed employees and students of legal age.  In "cases involving a student who meets the legal age of consent in his or her state, there will be a strong presumption that sexual activity between an adult school employee and a student is unwelcome and nonconsensual."  (2014 Q&A;Compl. ¶¶ 51–61.)

OCR publicly identified colleges and universities it was then investigating for potential violations of their obligation to comply with Title IX in the implementation of prompt and equitable sexual misconduct grievance procedures shortly after issuing the 2014 Q&A, and it listed JMU on June 4, 2014.  (Compl. ¶¶ 64–68.)  In August 2014, JMU created a Title IX Task Force that reviewed JMU's policies and procedures, and that Task Force (a) reviewed the new guidance documents from the OCR for compliance, (b) created new Policy 1340, Title IX, incorporating all current laws and guidance, and (c) expanded the number of Title IX officers. (Compl. ¶¶ 173–76.)

Notably, at the time of the 2011 DCL, JMU was already using a "preponderance of probative, reliable and substantial evidence" standard.  Pursuant to the 2011 DCL, JMU changed the wording to a preponderance of the evidence standard, citing the 2011 DCL regarding its Policy #1324 and #1340.  (Compl. ¶¶ 69–70.)

On September 22, 2017, and prior to the Title IX proceedings that are the subject of this lawsuit, then Secretary of the Department of Education Betsy Devos withdrew the 2011 DCL and the 2014 Q&A.  The press release stated that the "withdrawn documents ignored notice and comment requirements, created a system that lacked basic elements of due process and failed to ensure fundamental fairness."  (Compl. ¶¶ 80–85.)

### C.  James Madison University Policies and Procedures

#### 1.  Policy #1324

In August 2012, JMU adopted a revised Policy #1324 governing claims of "Discrimination and Harassment" (Policy #1324), which policy prohibits discrimination and harassment on the basis of sex or sexual orientation and applies in the employment relationship. (Dkt. No. 1-2 at 3–5.)  It also provides for employee complaints, which formal complaints are to be signed and in writing.  (*Id.*)  The policy prohibits anonymous complaints and complaints on behalf of another person (*id.* at 7), and it recommends the complainant contact the Title IX Office no later than 30 days "after the last behavior date" (*id.* at 6).  The respondent is to be notified.  (*Id.* at 7.)  Before proceeding, the Title IX Officer is to first determine whether the policy is applicable.  Policy #1324 governed faculty conduct from August 2012 to August/September 2016 (when it was replaced by Policy #1340).  (Dkt. Nos. 1-2 and 1-3.)

### 2.  JMU's 2016/2018 Policy #1340

In August/September 2016, after Lese had graduated from JMU, the University adopted an entirely new policy entitled "Sexual Harassment and Sexual Misconduct" (Policy #1340) (Dkt. No. 1-3), and in January 2018, it issued a newly-revised version of Policy #1340 governing "Sexual Misconduct" (Dkt. No. 1-4).  The new version, for the first time, equated the definition of a "nonconsensual" relationship with "sexual misconduct" and incorporated the concept into its Title IX policies and procedures.  Policy #1340 defined a "consensual relationship" as "[a] relationship between adult members of the university community which is freely and mutually entered into and continued, and is not coerced, influenced by an unfair power differential or the subject of any type of inappropriate or undue pressure or force."  (Dkt. No. 1-4 at 3.)

Again, a formal complaint must be in writing and signed, but a report may be communicated orally.  (Dkt. No. 1-4 at 4.)  No deadlines are mandated, but the university must be able to collect statements and address the allegations.  (Dkt. No. 1-4 at 16.)  Again, the Title IX Officer is to first decide whether the policy applies and dismiss the complaint if it does not.  (*Id.* at 13.)  The complainant and the accused party are not required to attend the hearing, to be subject to questioning by the hearing panel, or to be subject to cross-examination by the other party directly.  (*Id.* at 18; Compl. ¶¶ 219–221.)  Section 6.6.8.6 of Policy #1340 provided that "[b]oth the reporter and respondent shall have timely access to documents and information considered by the hearing panel."  (Dkt. No. 1-4 at 18.)  Moreover, "[t]he respondent is presumed to be not responsible unless sufficient evidence is presented to prove a violation of the policy has occurred."  (*Id.* at 19.)

**D.  Title IX Proceedings Against Reid**

On December 4, 2018, Lese sent an email message to Sirocky-Meck, JMU's Title IX

Coordinator, with an attached "Title IX Statement" that was both unsigned and undated.  (Dkt.

No. 1-5.)  Reid stresses that Lese's complaint was filed with JMU over three years after Reid and

Lese began their relationship, two and a half years after Lese finished her graduate degree, 18

months after they voluntarily moved in together, and over ten months (approximately 300 days)

after they ended their relationship.  (Compl. ¶¶ 299–300.)

Lese's Statement was limited to the November 2015 to May 2016 time frame.  According

to Reid, it did not allege that the relationship was nonconsensual or that Reid had violated a JMU

policy, engaged in "sexual misconduct," violated her rights under Title IX, sexually harassed her,

discriminated against her, or engaged in wrongful behavior.  (Compl. ¶¶ 302–312.)

Sirocky-Meck, the Title IX Coordinator, served as the Title IX officer for the complaint,

and she notified Reid of the complaint on December 13, 2018, but did not provide a copy until

February 2019.   (Compl. ¶¶ 313–323.)  Lese's statement was approximately two pages long,

redacted, and did not accuse Reid of engaging in a "nonconsensual" relationship.  The University

Defendants did not provide Reid with the factual or legal support for Sirocky-Meck's

determination that Lese's allegations somehow constituted a claim that Reid engaged in a

nonconsensual relationship.  (Compl. ¶¶ 357–360.)

Sirocky-Meck stated in her December 13 email that "[t]he specific incident of sexual

misconduct named by the reporter in the Formal Complaint is JMU Policy 1340.5.6 Non-

Consensual Relationship, specifically that you and Lese were involved in a romantic and sexual

relationship beginning Fall 2015 during the time when Lese was a graduate assistant with the

Individual events team that you served as Assistant Director for."  (Compl. ¶¶ 324–326.)  Reid

was further told that the Title IX office "does not adjudicate sexual misconduct cases for the university" but instead serves as a resource for the JMU employees involved in sexual misconduct complaints and that formal complaints of sexual misconduct against instructional Faculty with and without tenure and A&P faculty with tenure are heard through the Sexual Misconduct Accountability Process laid out in JMU Policy 1340.6.6.8 Sexual Misconduct Complaint process against faculty members.

Despite the above, Sirocky-Meck's December 13, 2018 email message was entitled "Notification of Title IX Formal complaint [sic]: Response needed by Friday Dec. 14 3:00 PM" and asked for Reid to inform Sirocky-Meck and Dr. Fife of her available times for a meeting, but Reid had already left for Christmas break.  Sirocky-Meck attached to her December 13, email a copy of the "Outline of the Sexual Misconduct Accountability Process for Complaints against Faculty Policy 1340-Sexual Misconduct," and a copy of the "Overview of the Procedures."  The 2012 Policy #1324, in effect from November 2015 to May 2016, was not provided.  (Compl. ¶¶ 329–337.)

JMU investigated Lese's complaint through March 2019, including taking witness statements from certain individuals identified by Lese and Reid.  The University Defendants did not provide Reid with a copy of Lese's "Title IX Statement" until after they interviewed Reid's supporting witnesses while Lese's witnesses were aware of the claims.  (Compl. ¶¶ 338–343.)

By email on March 13, 2019, Reid was advised of the hearing date and procedures and the persons to serve on the hearing panel.  Reid requested the appointment of someone from the LGBTQ community, but the University Defendants denied that request.  (Compl. ¶¶ 353–356.)  The faculty hearing was held on March 28, 2019, and was conducted pursuant to Policy #1340, not Policy #1324.  Reid attended in person, and Lese submitted a letter to be read to the hearing

panel.   While JMU's policies (both Policy #1324 and Policy #1340) required the University

Defendants to provide Reid with the letter prior to the hearing, they did not.  (Compl. ¶¶ 372–

381.)  Lese's four, unsworn and unsigned, witness incident statements acknowledged that Reid

and Lese were in a romantic relationship.  (Compl. ¶¶ 399–407.)

On April 1, 2019, the hearing panel found that Reid was responsible for violating Policy

1340 during the November 2015 to May 2016 time frame and recommended that Reid be

reprimanded.  (Dkt. No. 1-8; Compl. ¶¶ 420-422.)

The panel's Recommendations Report was then submitted to Dean Aguirre for final

determination with the options of adopting the recommendations, rejecting them and making a

different decision, or modifying them.  (Dkt. No. 1-8 at 3.)  Dean Aguirre reviewed the hearing

panel's findings and recommendation and found Reid to be "responsible" for engaging in a "non-

consensual relationship" in violation of JMU Policy # 1340.5.6.  He also opined that Reid's

relationship was "inappropriate" that Reid had violated JMU policy.  (Dkt. No. 10-1 at 3.)  He

also found that Lese had been subjected to "verbal abuse and retaliation" by Reid after their

relationship "went sour," at which time Lese had not been a student at JMU for approximately

two years.  Aguirre "recommended" and "suggested" that a letter of reprimand be issued against

Reid.  (Dkt. No. 10-1 at 4.)

Reid appealed to Vice-President/Provost Heather Coltman.  (Dkt. No. 10-1 at 2, 6.)

Reid's appeal was focused on the lack of due process and that the decisions of the hearing panel

and Dean Aguirre finding her to be "responsible" for engaging in sexual misconduct should be

reversed.  Coltman reviewed the underlying proceedings and issued her decision on June 19,

2019, based on an alleged violation of Policy #1340 (non-consensual relationship).  (Dkt. No. 1-

9.)  Coltman rejected Reid's claim that she was denied due process, concluded that Reid had

been informed of the charge of a "non-consensual relationship" under Policy #1340, and upheld Dean Aguirre's decision to find Plaintiff Reid "responsible" and adopted his recommendation to place a letter of reprimand in her personnel file.  (Dkt. No. 1-9 at 4.)

Reid resigned her position on a date not specified in the complaint.

## III.  ANALYSIS

### A.  Motion to Dismiss Standards

The University Defendants and ED move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) "challenges the legal sufficiency of a complaint, considered with the assumption that the facts alleged are true." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The principle that the allegations in a complaint must be accepted as true is "inapplicable to legal conclusions," and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* Affirmative defenses, such as a statute of limitations defense, can be the basis of a Rule 12(b)(6) motion to dismiss.  *Dickinson v. Univ. of N.C.*, 91 F. Supp. 3d 755, 763 (M.D.N.C. 2015) (citing *Dean v. Pilgrim's Price Corp.*, 395 F.3d 471, 474 (4th Cir. 2005)). For a statute-of-limitations defense to succeed at this stage, "all facts necessary to show the time bar must clearly appear 'on the face of the complaint.'" *Id.* (citing *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir.

2007)).  Additionally, a court may consider official public records, documents central to plaintiff's claims, and documents sufficiently referred to in the complaint without converting a Rule 12(b)(6) motion into one for summary judgment, so long as the authenticity of these documents is not disputed.[4]  *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006).

A Rule 12(b)(1) motion can be characterized as either a "facial" or a "factual" challenge to the court's subject matter jurisdiction.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  A facial challenge argues that the complaint fails to allege facts sufficient to support a finding that a court has subject matter jurisdiction.  *Id.*  Thus, if the Rule 12(b)(1) motion is a facial challenge, "'the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration.'"  *Id.* (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).  That is, the factual allegations of the complaint are treated as true.  *Id.*  In contrast, a factual challenge argues that the jurisdictional allegations of the complaint are not true.  *Id.*  Accordingly, in a factual challenge, there is no presumption that the facts in the complaint are true.  *Id.*  When a party challenges the factual basis for a federal court's subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of proving the district court possesses subject matter jurisdiction.  *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

**B.  University Defendants' Motion to Dismiss**

    **1.  Reid's due process and Title IX claims are barred by the statute of limitations**

The University Defendants move to dismiss Reid's due process and Title IX claims (counts I–IV), the only remaining claims against them, as untimely.  The parties agree that both

---

[4] Here, all parties agreed that consideration of the referenced documents is appropriate.

claims are subject to a two-year statute of limitations.  *See A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011) (explaining that the statute of limitations for § 1983 claims is the state limitations period for personal injury actions); Va. Code § 8.01-243(A) (setting forth a two-year limitations period for personal injury claims); *Wilmink v. Kanawha Cnty. Bd. of Educ.*, 214 F. App'x 294, 295 n.3 (4th Cir. 2007) (explaining that Title IX claims also borrow two-year personal injury statute of limitations).  The parties also agree that the time of accrual is governed by federal law.  *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995).  The parties disagree about when the claims accrued.  The University Defendants argue that the claims are untimely because they accrued no later than April 30, 2019, when Dean Aguirre issued his decision, more than two years before this lawsuit was filed on May 3, 2021.  Reid argues that her claims did not accrue until June 19, 2019, when Provost Coltman denied Reid's appeal and affirmed Dean Aguirre's decision.

"Under federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action."  *Nasim*, 64 F.3d at 955; *Doe v. Va. Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d 479, 490 (W.D. Va. 2019).  "The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful."  *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (quoting *Abramson v. Univ. of Haw.*, 594 F.2d 202, 209 (1979)).  In *Ricks*, the Court rejected the argument that the cause of action accrues when a grievance related to the adverse action is denied.  The court reasoned that "entertaining a grievance . . . does not suggest that the earlier decision was in any respect tentative.  The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made."  *Id.* at 261 (emphasis in original).  Moreover, "the pendency of a grievance, or some other method of

collateral review of an employment decision, does not toll the running of the limitations periods." *Id.*  While *Ricks* was a Title VII case, courts have applied the *Ricks* accrual analysis to Section 1983 due process claims and Title IX claims.  *See, e.g.*, *Doe*, 400 F. Supp. 3d at 490, 494 (due process and Title IX); *Endres v. N.E. Ohio Med. Univ.*, 938 F.3d 281, 293 (6th Cir. 2019) (due process).

Given the above, the cases turn on when a decision is final and whether any review is collateral or is part of a decision-making process that leads to a final decision.  Reid maintains that her claims did not accrue until June 19, 2019, when Provost Coltman made a final decision. She argues that the notices and procedures employed by JMU are "closely aligned" with those in a Sixth Circuit case.  *See Endres*, 938 F.3d 281.  In *Endres*, the court held that the claim did not accrue until the student "exhausted the appeals process." *Id.* at 294.  The procedures in *Endres*, however, implied that the decision "is not final while an appeal request is pending" and when the matter is remanded for reconsideration, "it effectively gives the accused student another shot at proving his innocence.  That is, the student gets another 'opportunity to *influence* [the] decision before it is made.'" *Id.* at 295 (quoting *Ricks*, 449 U.S. at 261) (emphasis in original).  "For one, the student has four working days to appeal an adverse [Committee on Academic and Professional Progress (CAPP)] decision to the [Executive Review Committee (ERC)].  Failure to file an appeal within that timeline amounts to a 'waiver of the right to appeal, and the decision *becomes final.*'" *Id.* at 294–95 (quoting record) (emphasis added).  "Second, [Northeast Ohio Medical University (NEOMED)]'s procedures explain that if the ERC refuses to grant the student's appeal, the CAPP decision *becomes final*." *Id.* at 295 (emphasis added).  As stated in *Endres*, a "collateral challenge necessarily implies the existence of a *final* decision." *Id.* at 294 (emphasis in original).

The JMU procedures are unlike the procedures in *Endres* because JMU made clear that Dean Aguirre's decision on April 30, 2019, was the final decision, even though Reid had the right to appeal that decision.  On April 1, 2019, the hearing panel found Reid responsible for sexual misconduct, a nonconsensual relationship, and recommended a sanction of reprimand. The April 1 Hearing Panel Report finding was a recommendation, and it made clear that Dean Aguirre's subsequent determination would be the final decision: "The AVP, Dean, or VP [over the Responding Party will determine the *final* outcome of the case.  The respondent's AVP, Dean or VP may adopt the recommendation of the hearing panel, reject them and make a different decision on the case, or modify them as he/she deems appropriate."  (Dkt. No. 1-8 at 3 (emphasis added).)  An attachment to the Hearing Panel Report ("Sexual Misconduct Complaint against a Faculty Member Decision and Appeal Process and Procedures") provides a date by which Dean Aguirre "must *finalize* [a] decision and notify Reporter and [Reid]."  (*Id.* at 5 (emphasis added).) Dean Aguirre's decision ("Faculty Sexual Misconduct Case Dean/Associate Vice President Written Decision") found that Reid was responsible for sexual misconduct for a nonconsensual relationship.  It was not a tentative or preliminary ruling.  The "Findings" section stated that the "decision of the Dean/AVP [is] based on the evidence submitted in the case file and during the hearing, using a preponderance of the evidence standard."  (Dkt. No. 10-1 at 3.)  And even though Reid had the right to appeal Dean Aguirre's decision, the appeal was limited to considering due process violations, newly discovered evidence, and harshness of sanctions.  (*Id.* at 6.)  When Provost Coltman upheld Dean Aguirre's decision, she referred to it as "the dean's *final* decision."  (Dkt. No. 1-9 at 4 (emphasis added).)

Accrual in April 2019 is also supported by the court's analysis in *Doe*, where the court addressed the accrual of due process and Title IX claims against a public university.  The court

rejected plaintiffs' arguments that the claims accrued at the conclusion of the appeals process. Accrual happened when the initial decision was made, even though the notices advised plaintiffs of a right to appeal and indicated that Virginia Tech would await the outcome of any appeal before sanctions would take effect. *Doe*, 400 F. Supp. 3d at 492–94. The court explained that the letter notices to the plaintiffs fell "squarely" within the "not equivocal" category. *Id.* at 492 (citing, for example, a letter referring to "final outcomes" of the conduct matter and "making the decision effective as of the 'final decision,' which is a reference to the hearing decision, but also giving an opportunity to appeal"). As set forth in *Ricks* and in *Doe*, the grievance or appeals process does not extend the date of accrual. *Id.* at 492 ("*Ricks* . . . noted that the existence of a grievance (here, an appeal) procedure does not mean that the initial decision was not made.").

In this case, Dean Aguirre's April 30, 2019 decision was a final decision, and Reid's appeal of that decision was a collateral challenge under the *Ricks* framework. Thus, Reid's Due Process and Title IX claims accrued in April 2019, and her claims are time-barred.

## C. Department of Education and Secretary Cardona's Motion to Dismiss

### 1. Reid does not have standing

The Department of Education and Secretary of Education Cardona move to dismiss Reid's claims against them for lack of standing. "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes," nor do they "possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). To demonstrate standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of

regulation) of *someone else*, much more is needed," and standing "is ordinarily substantially more difficult to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (internal quotations omitted).

Reid argues that she has standing because she was injured by JMU's faulty Title IX procedure, which was directly traceable to the ED, and the relief sought would likely induce JMU to reconsider its findings and punishment. She maintains that because the 2011 DCL and 2014 Q&A were designed to coerce universities to adopt certain procedural standards for responding to Title IX complaints, the chain of causation to her injury is preserved.

Indeed, the Supreme Court has held that the actions of third parties in response to agency action can be traceable and establish standing against the agency. *See, e.g.*, *Dep't of Commerce. v. New York*, 139 S. Ct. 2551, 2566 (2019) ("Respondents' theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties."). In support of her argument that the 2011 DCL and the 2014 Q&A predicably affected JMU's actions by expressly stating that they should be used to inform recipients about how the OCR evaluates whether covered entities are complying with their legal obligations, Reid cites *Bennett v. Spear*, 520 U.S. 154 (1997), as an example. In *Bennett*, the Fish and Wildlife Service released a Biological Opinion that advised another agency how to avoid jeopardizing endangered species in its operations. The document, though technically "advisory," was intended to play a "central role" in the agency's decision-making process to generate a complete administrative record with respect to endangered species impacts. *Id.* at 169. The agency was free to disregard the guidance but required to justify its deviation and face penalties if its decision turned out wrong. *Id.* at 170. The Biological Opinion had a "virtually determinative" effect on the acting agency such that the injury sustained by the

plaintiff was traceable to the Fish and Wildlife Service. *Id.* She also relies upon *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000), where "… Guidance, from beginning to end—except the last paragraph—reads like a ukase [in that] [i]t commands, it requires, it orders, it dictates."

Reid, however, ignores the fact that the cases upon which she relies involved agency guidance that was still in effect at the time of the alleged injury. *See, e.g.*, *Dep't of Commmerce*, 139 S. Ct. at 2566 (challenging Secretary of Commerce memo reinstating question about citizenship on the 2020 census questionnaire that was in effect at the time of the alleged injury).[5] While an injury may be traceable "where the plaintiff suffers an injury that is produced by the determinative or coercive effect of the defendant's conduct upon the action of someone else," *Lansdowne on the Potomac Homeowners Ass'n v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (internal quotations omitted), here, the guidance issued by ED (the 2011 DCL and 2014 Q&A) was withdrawn in 2017 before Reid's Title IX proceeding began. JMU's choice to leave its policies in place despite the withdrawn guidance is just that – its own choice. A party lacks standing if an intermediary stands "between the plaintiff and the challenged actions." *Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 235 (4th Cir. 2005). So, even if the regulations had a coercive effect while they were in force, JMU stands as an intermediary between Reid and the ED, so any injury to Reid is not fairly traceable to the federal government.

Moreover, while the focus of the complaint is on the use of the preponderance of the evidence standard advised by the 2011 DCL and the 2014 Q&A, JMU's standard of proof prior

---

[5] Additionally, in Department of Commerce, the Census Bureau itself conceded that the response rate discrepancy was "likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." 139 S. Ct. at 2566. Here, there is no concession.

to this guidance was already "preponderance of probative, reliable and substantial evidence." (Compl. ¶ 69.)  Reid also concedes that even if JMU had been required to follow the guidance, JMU still should have found that Reid did not violate JMU policy.  Thus, any coercive and/or causal link between the 2011 DCL and 2014 Q&A and Reid's alleged injuries was broken.

Finally, there is no relief left to award Reid under the APA even if the guidance were subject to APA withdrawal.  Reid asks the court to issue a declaratory judgment forbidding ED from issuing substantially similar guidance or rules in the future.  Reid lacks standing because she fails to plausibly allege either that she will be subject to a Title IX hearing in the future or that the ED will adopt unlawful guidance or rules.  The declaratory judgment act requires a "case of actual controversy within [the Court's] jurisdiction," 28 U.S.C. § 2201(a), which means that "the dispute must be a 'case or controversy' within the confines of Article III of the United States Constitution."  *White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 167 (4th Cir. 1990).  Instead of past injury, a plaintiff must demonstrate the existence of either an "ongoing injury," *McBurney v. Cuccinelli*, 616 F.3d 393, 403 (4th Cir. 2010), or a future "threatened injury must be certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

The 2011 DCL and 2014 Q&A had been withdrawn before Reid's Title IX proceeding. Reid cites no case where rescinded agency guidance can establish standing under the theory that regulated parties would predictably ignore the rescission.  This break in the chain of causation disassociates the federal government from Reid's injuries, and Reid lacks standing to pursue her claims against ED.

**2. There was no final agency action, and Reid has an adequate alternative remedy**

Even if Reid had standing to challenge the 2011 DCL and 2014 Q&A, the court would still lack jurisdiction because Reid does not challenge final agency action, and she does not allege the lack of an adequate alternative remedy.

For agency action to be final, the action first must "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013). The 2011 DCL and 2014 Q&A do not satisfy the second element as neither document imposed any legal consequences or determined any rights or obligations. For example, as the Fourth Circuit has explained, the purpose of an agency's response to frequently asked questions is "simply to inform licensees of what the law, previously enacted or adopted, is, and its publication did not itself alter the legal landscape." *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010). It also does not matter if the guidance is coercive. *Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. EPA*, 313 F.3d 852, 859 (4th Cir. 2002) (no matter how much "coercive pressures on third parties" an agency guidance document generates, it is not final agency action if it "carries no legally binding authority").

Finally, Reid has an adequate alternative remedy for her asserted injuries, which is to sue the University Defendants. A "private cause of action against a third party otherwise subject to

agency regulation" constitutes an adequate alternative remedy.  *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009) (internal citations omitted).[6]

## III.  CONCLUSION

For the reasons stated herein, the court will issue an appropriate order granting the motions to dismiss.

Entered: March 29, 2022.


*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

---

[6] It is not necessary to address the argument brought by ED that Reid's claims are barred by the statute of limitations.

21